Edward C. Victorson and Anne Victorson v. Commissioner. Graham, Ross & Co., Inc. v. Commissioner.
Victorson v. Commissioner
Docket Nos. 83595, 83596.
United States Tax Court
T.C. Memo 1962-231; 1962 Tax Ct. Memo LEXIS 77; 21 T.C.M. (CCH) 1238; T.C.M. (RIA) 62231; October 1, 1962
Martin M. Lore, Esq., 107 William St., New York, N. Y., for the petitioners. Theodore E. Davis, Esq., and Leon M. Kerry, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion In these consolidated cases, the Commissioner determined deficiencies in income tax and additions to tax as follows: Docket No. 83595, Edward C. Victorson
and Anne Victorson
Year
Deficiency
1954
$ 4,461.64
1955
23,758.54
1956
15,170.97
Docket No. 83596, Graham, Ross & Co., Inc.
Addition to Tax
Year Ended
Deficiency
Section 6653(b)
April 30, 1955
$22,775.04
$11,387.52
April 30, 1956
74,652.87
37,326.44
April 30, 1957
52,553.14
*78 By amendment to his answer in Docket No. 83596, the Commissioner affirmatively alleged that the $127,350 in additional income which the deficiency notice had determined was realized by the corporate petitioner in either its fiscal year ended April 30, 1956 or 1957, was, in the alternative, realized by the corporate petitioner in its fiscal year ended April 30, 1955. After certain concessions by petitioners, the issues remaining for decision are: (1) whether payments to Miriam Ross Victorson in 1954 and 1955 by Graham, Ross & Co. constituted dividends to its sole stockholder, Edward C. Victorson; (2) and (3) whether the exercise of certain options to purchase stock in each of two corporations in 1955 resulted in taxable income; if it did, when and in what amounts did it constitute such income; and, in the case of Edward C. Victorson, whether such income constituted a dividend from Graham, Ross & Co.; (4) whether Graham, Ross & Co. is entitled to deductions for business expenses for the taxable years in issue in excess of those allowed by the Commissioner; and (5) whether the failure of Graham, Ross & Co. to file corporate income tax returns for its fiscal years ended April 30, 1955 and *79 1956 and the resulting underpayment of taxes was due either to fraud or, in the alternative, to willful neglect without reasonable cause. Findings of Fact The facts stipulated by the parties are incorporated herein by this reference. Edward C. and Anne Victorson, husband and wife residing at 2575 Jerome Avenue, Bronx, New York, filed joint income tax returns for the taxable years 1954, 1955, and 1956 with the district director of internal revenue for the Upper Manhattan district of New York. Anne is a party hereto solely because joint returns were filed. Edward will be referred to hereinafter as Victorson. Graham, Ross & Co., Inc., a New York corporation with offices at 141 Broadway, New York, New York, filed its corporate income tax return for the fiscal year ended April 30, 1957, with the district director of internal revenue for the Lower Manhattan district of New York. The corporation, hereinafter referred to as Graham Ross, did not file corporate income tax returns for the fiscal years ended April 30, 1955 and 1956. During the taxable years in issue, Graham Ross was engaged in the stock brokerage and underwriting business as an over-the-counter house. 1. In January *80 1954, the authorized capital stock of Graham Ross consisted of 300 shares of preferred stock, all of one class and without par value, and 200 shares of common stock, also all of one class and without par value. At that time, the company had issued an outstanding 200 shares of preferred stock and 100 shares of common stock. Victorson became a salesman for Graham Ross in 1948, at which time all of the issued and outstanding stock of Graham Ross was owned by Victorson's brother who actively ran the business. Thereafter, Victorson became the manager of the sales force of Graham Ross. Victorson's brother died in September 1953, and left all of the issued and outstanding stock of Graham Ross to his wife, Miriam Ross Victorson. Under the terms of an agreement dated January 27, 1954, between Victorson as "buyer", Miriam Ross Victorson as "seller", and Graham Ross, Victorson agreed to purchase all of the issued and outstanding stock of Graham Ross from Miriam Ross Victorson for a total price of $30,500, payable by Victorson to Miriam Ross Victorson in specified installments from the date of the agreement until July 1, 1955. The agreement provided among other things that Victorson would *81 sign a series of nonnegotiable promissory notes to evidence the payments required thereunder and such notes would contain an acceleration clause in the even of a default for ten days after notice given by the seller, that the buyer pledged all of the stock purchased as collateral for his obligations thereunder, and that simultaneously with the execution of the agreement the seller would resign as an officer and director of Graham Ross and the buyer would be elected president, treasurer, and a director of the company. The agreement further specifically provided that any amounts received by Victorson from Graham Ross in respect of the stock purchased and pledged "whether as dividends, redemption price, or otherwise" would be paid over to the seller, Miriam Ross Victorson, to the extent of the unpaid balance of the purchase price and would be applied against succeeding installments due on the purchase price. On January 27, 1954, simultaneously with the signing of the foregoing agreement, Miriam Ross Victorson resigned as an officer and director of Graham Ross and Victorson was elected president, treasurer, and a director. At all times thereafter during years 1954 through 1957, Victorson *82 was the sole stockholder, president, treasurer, and a director of Graham Ross, was the only officer who was active in the control and management of the corporation, and was personally in full charge of all phases of the corporation's activities. All other officers and directors of Graham Ross were only nominal and served in name only. During the year 1954, Graham Ross paid a total amount of $13,500 to Miriam Ross Victorson in partial payment for the stock purchased from her by Victorson under the agreement of January 27, 1954. Total payments in the amount of $6,500 were made by Graham Ross to Miriam Ross Victorson during the year 1955 for the same purpose. All such payments by the corporation were made in connection with the acquisition by Graham Ross of shares of its preferred stock from Victorson which it held thereafter as treasury stock. Pursuant to the terms of the agreement of January 27, 1954, payment for such preferred stock was made directly to Miriam Ross Victorson in discharge of Victorson's obligation under the stock-purchase agreement. The Commissioner determined that the payment by Graham Ross to Miriam Ross Victorson of $13,500 in 1954 and $6,500 in 1955 constituted *83 dividends in like amounts to Victorson in these years. Such payments, in discharge of Victorson's obligation to Miriam Ross Victorson and resulting in the redemption by Graham Ross of preferred stock owned by Victorson which he had purchased from Miriam Ross Victorson, were in fact essentially equivalent to dividends to Victorson. 2. Under date of September 21, 1954, Graham Ross entered into an underwriting agreement with Hosid Products Corp. (subsequently known as Glamur Products, Inc.) and the president and principal shareholder thereof, Jack Hosid, individually, whereby Hosid Products Corp. proposed to issue 600,000 shares of its common stock at the public offering price of 50 cents per share and to employ Graham Ross as the exclusive underwriter therefor. Hosid Products Corp., among other things, agreed to amend its certificate to effect the change of its corporate name to one which contained the name "Glamur", the trademarked name of the upholstery and rug cleaning product which it manufactured and distributed. As compensation to Graham Ross for the underwriting, a commision of 12 1/2 cents per share with respect to all shares sold was provided. An added 12 1/2 cents per share *84 until a total of $20,000 had been paid was provided to cover the costs and expenses to Graham Ross incident to the public offer. In a separate section of the agreement entitled "Underwriter's Additional Compensation", it was provided that in order to induce Graham Ross to enter into the underwriting, Jack Hosid individually agreed to sell to Graham Ross or its nominees for one mill ($.001) per share one share for every six shares publicly sold up to 100,000 shares, and if all of the publicly offered stock was sold by Graham Ross, Hosid additionally agreed to sell a separate block of 50,000 shares to Victorson at one mill ($.001) per share. It was noted that none of the aforesaid 150,000 shares of stock was then being qualified or registered under the Securities Act of 1933, and it was agreed that the shares thus purchased would be held by the purchaser or nominees of the purchaser for a period of 12 months from the effective date of the notification to the Securities and Exchange Commission of the public offering, and that thereafter Hosid Products Corp. agreed at its expense to qualify such stock for public sale under the Securities Act of 1933. In October, 1954, Hosid Products *85 Corp. changed its corporate name to Glamur Products, Inc. In connection with the underwriting of the public offering of Glamur Products stock, Victorson arranged for Glamur Products to obtain a loan in the amount of $10,000. Victorson was of the opinion that Glamur Products did not have sufficient money in the bank (only about $12,000) to make its stock marketable. He thought that if Glamur Products could show a larger cash balance on the balance sheet in the prospectus, even though there was an offsetting liability, its stock would be more attractive to some potential buyers. As a result, Victorson arranged for three persons to lend Glamur Products a total of $10,000 for a period of three months. These three individuals were Kurt Blatt, a customer of Graham Ross, who put up $5,000, and George Weiss, another Graham Ross customer, and Bessie Dale, Victorson's secretary, each of whom put up $2,500. The loan agreement, dated October 21, 1954, provided that the loan was to be repaid from the first proceeds of the planned underwriting. The lenders were to receive no interest as such for the loan, but Jack Hosid as an individual signer of the loan agreement agreed that he would sell *86 the equivalent of 10,000 shares of Glamur Products stock to the lenders or their nominees, 5,000 shares to Kurt Blatt and 2,500 shares each to George Weiss and Bessie Dale, for an aggregate price of $10. The lenders agreed that they would purchase such stock for investment and would not acquire it with a view to public distribution. On October 27, 1954, Glamur Products filed a Notification, Form 1-A, with the Securities and Exchange Commission (hereinafter referred to as the S.E.C.) with regard to the public offering of 600,000 shares of its stock, pursuant to Regulation A of the general rules and regulations of the Securities Act of 1933, as amended, and the Offering Circular was filed therewith. In regard to the option granted by Jack Hosid to Graham Ross to purchase 100,000 shares of his Glamur Products stock and to Victorson to purchase 50,000 shares of such stock, both the Notification and the Offering Circular stated that Glamur Products agreed after 13 months (instead of 12 months as provided in the underwriting agreement) to qualify such stock for public sale under the Securities Act of 1933, as amended, or to include such stock in any registration statement which might be *87 filed prior to the expiration of the 13-month period. The Offering Circular, as finally published and distributed, was dated November 12, 1954. Graham Ross first sold Glamur Products stock to the public on November 18, 1954, and the offering was successfully completed on February 1, 1955. On May 23, 1955, Graham Ross exercised its option pursuant to the terms of the underwriting agreement of September 21, 1954, to purchase 100,000 shares of Glamur Products stock from Jack Hosid at one mill ($.001) per share. On the same day, Victorson exercised his option under the same agreement to purchase 50,000 shares of Glamur Products stock from Jack Hosid at the same price. Graham Ross paid $150 to Hosid for its 100,000 shares plus Victorson's 50,000 shares. A correcting entry in the ledger of Graham Ross as of September 19, 1956, reflects that 50,000 shares were in fact purchased by Victorson on May 23, 1955, and only 100,000 shares were purchased by the corporation Of the 100,000 shares acquired by Graham Ross, it is stipulated that 46,498 were transferred to its salesmen and other employees. This stock was so transferred as a bonus for participation in the successful underwriting. *88 All of the 150,000 shares purchased by Graham Ross and Victorson pursuant to options granted by Jack Hosid were restricted from public sale for a period of at least 12 months from the effective date of the Notification by the underwriting agreement of September 21, 1954. The Notification and the Offering Circular indicated that such restriction was for a period of 13 months from the effective date of the Notification, unless included in any registration statement which might be filed by Glamur Products prior to the expiration of the 13-month period. Such restriction did not apply to the private sale of the option stock prior to the expiration of the 12 or 13 month period. Late in 1955 Graham Ross and Victorson requested that Glamur Products qualify the option stock for public sale as Glamur Products had agreed it would do in the underwriting agreement of September 21, 1954. Up to $50,000 worth of such stock could be so qualified by a letter of notification to the S.E.C.; qualification of more than $50,000 worth of such stock would require full registration and publication of a prospectus. After a delay, Glamur Products filed a Notification, Form 1-A, with the S.E.C. on August 9, 1956, to *89 qualify $50,000 worth of the option stock for public sale. Pursuant to such Notification, Graham Ross sold 23,200 shares of its option stock for a net amount of $18,087.25 and Victorson on September 24, 1956, sold 40,000 shares of his option stock for a net amount of $23,264.55. Thus, a total of 63,200 shares of the option stock were sold for an aggregate net amount of $41,351.80. The remaining shares that had been qualified for sale by the Notification were placed back into the restricted account. To the date of trial herein, no further sales were made of the option stock held by Graham Ross and Victorson. During the year 1955 at least 18 brokers including Graham Ross were quoting bid and asked prices or either for Glamur Products stock. There were quoted bid prices in 1955 ranging from a low of 50 cents to a high of 80 cents and asked prices ranging from a low of 65 cents to a high of 90 cents. In May of 1955 Graham Ross as a broker traded a total of 21,150 shares of registered Glamur Products stock, with purchases ranging from 75 cents to 93 3/4 cents and sales ranging from 89 cents to 93 3/4 cents. Additional shares of the same stock, in undisclosed amounts, were traded during *90 the same month through other brokers. In Exhibit A to the Notification, Form 1-A, sent by Glamur Products to the S.E.C. on August 9, 1956, to qualify $50,000 worth of the option stock for public sale, it was stated that the market price of Glamur Products stock on August 8, 1956, was 55 cents bid and 65 cents asked. Graham Ross and Victorson sold a total of 63,200 shares of Glamur Products stock in August and September of 1956 pursuant to such Notification at an average price of about 65 cents per share. Thereafter, the price of Glamur Products stock remained at about the same level for two or three months. Toward the close of 1956 and during 1957, the market price of Glamur Products stock declined. The Commissioner determined that Graham Ross realized additional income in the amount of $127,350 by the "bargain purchase of option stock" by Glamur Products in either the fiscal year ending April 30, 1956 or 1957. By amendment to his answer, the Commissioner alleged in the alternative that such amount was realized by Graham Ross in its fiscal year ended April 30, 1955. The Commissioner determined that Victorson realized additional income in the amount of $42,500 by the "bargain purchase *91 of option stock" of Glamur Products in either the taxable year 1955 or 1956. The fair market value of the Glamur Products stock purchased by Graham Ross and Victorson on May 23, 1955, was 50 cents per share. 3. Graham Ross acted as underwriter in the distribution of 150,00 shares of common stock of Wilson Organic Chemicals, Inc., in 1952 at an offering price of two dollars per share. In connection with this underwriting and as part of its compensation therefor, Graham Ross received an option to purchase 7,500 shares of Wilson Roganic Chemicals common stock at 25 cents per share. On March 8, 1955, Graham Ross exercised this option. Of the 7,500 shares thus acquired by Graham Ross, 400 shares were transferred to Michael Scherzer, its accountant at the time, in addition to his regular salary, for services rendered by him. During the period from January through September of 1955, at least 11 brokers including Graham Ross were quoting bid and asked prices or either for Wilson Organic Chemicals common stock. From January 18, 1955 through March 31, 1955, the over-the-counter bid and asked quotations on such stock ranged between 7/8 and 1 1/8 bid and between 1 and 1 1/2 asked. On both *92 February 28, 1955 and March 29, 1955, the over-the-counter quotations on Wilson Organic Chemicals common stock were 1 bid and 1 3/8 asked. The Commissioner determined that Graham Ross realized additional income in the amount of $6,562.50 as the result of the "bargain purchase" of 7,500 shares of Wilson Organic Chemicals common stock on March 8, 1955. The fair market value of the Wilson Organic Chemicals common stock purchased by Graham Ross on March 8, 1955 was $1.125 per share. 4. Victorson was born on September 21, 1912. He completed three and one-half years of high school but did not finish high school and did not attend college. Before becoming a salesman for Graham Ross in 1948, his working experience had included work for a shipyard company, work as a salesman for some drug companies, and for a short time he engaged in the business of buying and selling drug sundries. Before his brother's death in 1953, Victorson managed the Graham Ross sales force. Victorson took over complete charge of Graham Ross in January 1954. At that time the corporation had about 20 employees, including 10 salesmen. At the start Victorson found it necessary to work evenings and weekends to get *93 his many new administrative duties completed and to acquire contacts so that profitable underwritings might be given to Graham Ross. He was a good golfer and found that he was able to meet potential clients and customers while playing golf on weekends. He continued to train and supervise the sales force and on occasion would assist salesmen in dealing with customers. In the beginning Victorson split commissions with some salesmen, but later Victorson had any share of a commission to which he might be entitled go back into the trading account of Graham Ross. In his income tax returns for the years 1954, 1955 and 1956, Victorson reported compensation from Graham Ross in the total amounts of $8,730, $11,019, and $6,260, respectively. No dividends were reported from Graham Ross in any of these years. Under the agreement of January 27, 1954, by which Victorson purchased all of the issued and outstanding stock of Graham Ross from Miriam Ross Victorson, Victorson among other things agreed that so long as he remained obligated thereunder for a portion of the purchase price his salary from Graham Ross would not be increased beyond the amount of $10,000 per annum and, in addition, that any *94 amounts he received in respect of the stock purchased, whether in the form of dividends, by redemption, or otherwise, would be paid over to Miriam Ross Victorson to be applied against his remaining obligation to her. Victorson's obligation under the agreement was fully discharged in July of 1955. The Commissioner determined that income realized by Victorson in 1954 and 1955 as a result of payments made by Graham Ross in discharge of Victorson's obligation to Miriam Ross Victorson constituted dividends to Victorson in such years and not additional compensation deductible by Graham Ross. Similarly, the Commissioner determined that income realized by Victorson as a result of the receipt of 50,000 shares of Glamur Products stock constituted a dividend to Victorson from Graham Ross and not additional compensation from Graham Ross. The Commissioner allowed no deduction to Graham Ross for the value of the 46,498 shares of Glamur Products stock which Graham Ross had transferred to its salesmen and other employees as a bonus for participation in the successful Glamur Products underwriting. The Commissioner allowed no deduction to Graham Ross for the value of the 400 shares of Wilson Organic *95 Chemicals stock which Graham Ross had transferred to its then accountant, Michael Scherzer, in addition to his regular salary. 5. Graham Ross filed corporate income tax returns for its fiscal years ended April 30, 1954 and April 30, 1957, both of which were signed by Victorson as president. No returns were filed by Graham Ross for its fiscal years ended April 30, 1955 and 1956. Graham Ross did file a request, dated June 29, 1955, and signed by Victorson as president, for an extension of time in which to file its return for its fiscal year ended April 30, 1955, but no return was in fact filed for that fiscal year or the following fiscal year. When Victorson became president of Graham Ross in January of 1954, the corporation had in its employ an acountant, Michael Scherzer (now deceased), who was paid $200 per month to do the firm's accounting work, furnish financial statements, and file necessary regulatory and tax reports and forms. Victorson retained Scherzer and relied on him to keep him informed of the financial condition of Graham Ross by monthly financial statements and to prepare and file all necessary reports with the S.E.C., the Internal Revenue Service, and other regulatory *96 and taxing authorities. During the early part of 1956, Scherzer stopped supplying Victorson with monthly financial statements in spite of Victorson's repeated requests therefor. Finally, after four or five months had gone by without Victorson having received such statements, Victorson went to his attorney for advice. His attorney recommended that Graham Ross hire a new accountant, Ernest Baker (now deceased), who had some experience in the securities business. Victorson hired Baker sometime in July or August of 1956. Baker immediately set to work to put Graham Ross' books in order. Baker determined that Graham Ross had failed to file income tax returns for its fiscal years ended April 30, 1955 and 1956, and attempted to collect the necessary information to file such returns. Victorson was aware of his responsibility as president of Graham Ross to see that corporate income tax returns were filed for Graham Ross in 1955 and 1956. Victorson was currently aware of the financial position and earnings of Graham Ross throughout 1955. During part of 1956, due to the failure of the accountant Scherzer to furnish him with financial statements each month, Victorson was not kept current *97 on the corporation's earnings and general financial position. Victorson was the only officer or employee of Graham Ross authorized to sign corporate checks with his signature alone appearing thereon. Three employees of Graham Ross (the cashier, Victorson's secretary Bessie Dale, and Miriam Ross Victorson) were authorized to sign corporate checks in amounts up to $1,000 if two of the three signed such checks. Michael Scherzer, the accountant, did not have authority to sign corporate checks. In the case of taxes owed by Graham Ross, Scherzer would normally make out the check for the amount payable by Graham Ross and bring it to Victorson for the latter's signature. Neither Michael Scherzer nor his successor Ernest Baker was an officer of Graham Ross. Neither was a certified public accountant. Graham Ross did not issue any check for or otherwise make payment of Federal income taxes due for its fiscal years ended April 30, 1955 and 1956. The Commissioner determined that the failure of Graham Ross to file income tax returns and the resulting underpayment of its taxes for its fiscal years ended April 30, 1955 and 1956 was due to fraud and that Graham Ross was thereby liable for a *98 50 percent addition to the tax for such years under Section 6653(b) of the 1954 Code. In the alternative, the Commissioner determined that such failure was not due to reasonable cause but was due to willful neglect and that Graham Ross was thereby liable for a 25 percent addition to the tax for its fiscal years ended April 30, 1955 and 1956 pursuant to Section 6651 of the 1954 Code. Deficiencies in income tax of Graham Ross for its fiscal years ended April 30, 1955 and 1956 are not due in whole or in part to fraud. The failure of Graham Ross to file its income tax returns for its fiscal years ended April 30, 1955 and 1956 was not due to reasonable cause but was due to willful neglect. Opinion RAUM, Judge: 1. By an agreement dated January 27, 1954, Victorson purchased all of the issued and outstanding stock of Graham Ross from Miriam Ross Victorson, the widow of Victorson's deceased brother. Payment for the stock was provided in installments starting from the purchase date and continuing to July of 1955. Thereafter from time to time during 1954 and 1955, Victorson caused Graham Ross to redeem all of the preferred stock he had purchased and to pay the redemption price thereof *99 directly to Miriam Ross Victorson in discharge of part of Victorson's obligation to her under the stock-purchase agreement. The Commissioner has determined that such payments by Graham Ross, amounting to $13,500 in 1954 and $6,500 in 1955, constituted dividends to Victorson. We think that this determination is correct. We have made an ultimate finding that in the circumstances the redemptions in question were essentially equivalent to the distribution of dividends to Victorson. Section 302(b)(1), Internal Revenue Code of 1954. In effect, Victorson as sole shareholder of Graham Ross used corporate surplus to assist him in discharging his personal obligation to Miriam Ross Victorson under the stock-purchase agreement. In the absence of a redemption, there is no question that such use of corporate funds for Victorson's benefit would constitute a dividend to Victorson. Cf. Louis Greenspon, 23 T.C. 138, 151, affirmed on this point but reversed on other grounds 229 F. 2d 947 (C.A. 8); Alex Silverman, 28 T.C. 1061, affirmed 253 F. 2d 849 *100 (C.A. 8). We think that the redemption of Victorson's preferred stock in no way changes the result. He remained the sole stockholder after the redemptions in question. No corporate purpose for the acquisition of the preferred stock as treasury stock has been suggested. The redemptions represent merely a use of corporate funds to satisfy Victorson's personal obligation, without altering Victorson's relationship to Graham Ross in the slightest. As such, the redemptions were essentially equivalent to dividends to Victorson. Wall v. United States, 164 F. 2d 462 (C.A. 4); Aloysius McGinty, 38 T.C. ; cf. Ferro v. Commissioner, 242 F. 2d 838 (C.A. 3), affirming a Memorandum Opinion of this Court; Schalk Chemical Co., 32 T.C. 879, affirmed 304 F. 2d 48 (C.A. 9). Revenue Ruling 59-286, 1959-2 C.B. 103, relied upon by petitioners, is not to the contrary. In the situation outlined in the ruling two brothers each owned 50 percent of the stock of a corporation, subject to an agreement providing that upon the death of either of them the survivor would either purchase the stock of the decedent or vote his stock for liquidation *101 of the corporation. One brother died and the corporation redeemed all of the shares held by the estate at fair market value for corporate business reasons. The ruling held that the redemption did not constitute a payment of a constructive dividend to the remaining shareholder. In the present case, Victorson was not a remaining shareholder but was the only shareholder at the time of the redemptions, the shares redeemed had been acquired by Victorson by creating an obligation which the redemptions partially discharged, and no corporate business reasons were here present for the redemptions. Thus, the factual picture here is quite different. It is significant that the cited ruling expressly distinguishes the Wall case, supra, which is virtually indistinguishable from the instant case. Similarly, the facts in John Decker, 32 T.C. 326, affirmed 286 F. 2d 427 (C.A. 6), cited by petitioner, are distinguishable from the present case and from Wall for the reasons stated in Decker (32 T.C. at p. 333) distinguishing Wall. 2. The second issue involves options to purchase stock of Glamur Products, Inc. held by Graham Ross and Victorson in connection *102 with the underwriting of Glamur Products stock by Graham Ross. Under the terms of the underwriting agreement, if Graham Ross was successful in selling all of the 600,000 shares of Glamur Products stock subject to the underwriting, the president and principal stockholder of Glamur Products, Jack Hosid, individually agreed to sell 100,000 shares of his Glamur Products stock to Graham Ross or its nominees and 50,000 shares to Victorson at the price of one mill per share. Such option stock was not to be subject to public sale by the grantees of the options for a period of at least 12 months after the effective date of the notification of the underwriting to the S.E.C. (unless Glamur Products filed a registration statement in the interim), and after this period Glamur Products agreed to qualify the option stock for public sale. Private sale of the option stock during the specified 12-month period was not prohibited by the terms of the options. Graham Ross successfully completed the underwriting on February 1, 1955. On May 23, 1955, Graham Ross and Victorson exercised their options to purchase an aggregate of 150,000 shares of Glamur Products stock from Jack Hosid for a total price of $150. *103 Of the 100,000 shares acquired by Graham Ross, 46,498 were transferred to its salesmen and other employees as a bonus for participation in the successful underwriting. The Commissioner determined that Graham Ross realized income in the amount of $127,350 by the bargain purchase of 150,000 shares of Glamur Products stock on May 23, 1955. In the alternative, he maintains that such income was realized by Graham Ross on February 1, 1955, when the underwriting was completed and it became entitled to the option stock, or in November of 1955 when the restraint against public sale presumably expired, or in August of 1956 when a portion of the option stock purchased was qualified for public sale. The Commissioner determined that Victorson realized $42,500 in additional income by the purchase of the Glamur Products option stock, and at the trial and on brief the Commissioner maintains that such income constituted a dividend to Victorson from Graham Ross. The compensatory nature of these options is not in issue. Nor do petitioners deny that the exercise of such compensatory options results in ordinary *104 income to the optionees to the extent that the fair market value of the stock purchased exceeds the option price paid for such stock. [1] Cf. Commissioner v. LoBue, 351 U.S. 243; Wanda V. Van Dusen, 8 T.C. 388, affirmed 166 F. 2d 647 (C.A. 9); William S. Thornhill, 37 T.C. 988; Rev. Rul. 62-49, 1962-1 C.B. 13. The matters in controversy with regard to these options are whether the Glamur Products stock had an ascertainable fair market value on the date the options were exercised or at any other time pertinent herein, whether the Commissioner properly determined that the date these particular options were exercised is the time that Graham Ross and Victorson realized income on the option stock, whether Graham Ross is chargeable with income in respect to the 50,000 shares of option stock which Victorson purchased and the 46,498 shares of such stock which Graham Ross had transferred to its salesmen and employees, and whether income attributable to Victorson as a result of the option stock which he purchased constituted a dividend to him from Graham Ross. *105 We consider first the point in time at which Graham Ross and Victorson realized income on the option stock. We think that the date the options were exercised, May 23, 1955, is the proper time. It was on that date that Graham Ross and Victorson elected to purchase the stock under the terms of the options and to receive thereby both the immediate and the anticipated benefits which were included in the bargain purchase of this stock. Thus, in accordance with the cases cited above, we hold that the date of exercise or election is an appropriate time for the inclusion of income with respect to such stock options. Petitioners maintain that February 1, 1955, is a more significant date, because it was then that Graham Ross successfully completed the underwriting and became entitled with Victorson to purchase the option stock. If the option stock had been given to Graham Ross and Victorson rather than purchased by them, we could agree that the date of qualification was more significant than the date of exercise of the options. But these were options to purchase, albeit for a small amount, and in *106 the circumstances we think it would not be proper to say that Graham Ross or Victorson realized any income with respect to the option stock until the date they in fact made the investment required under the options. We turn next to the question of the fair market value of the option stock. Petitioners argue that the restrictions contained in the options against the public sale of this stock, together with the alleged highly speculative nature of Glamur Products stock, make it impossible to ascertain its fair market value on the day the options were exercised. We have set forth in the findings the restrictions on sale which were applicable to the option stock. The options provided that in effect such stock would not be sold to the public for at least 12 or 13 months [2] after the effective date of the notification of the underwriting to the S.E.C. After that time, Glamur Products agreed to qualify the option stock for public sale. When the options were exercised on May 23, 1955, this restriction on public sale still had some six months to run. However, the restriction on public sale of the option stock did not prevent private sale in the interim. Thus, at any time after the exercise *107 of the options, Graham Ross and Victorson could have sold their option stock in one or more private sales without violating the terms of the options. In these circumstances, we think that the restrictions on the sale of the option stock, limited as they were in scope and in time, did not prevent such stock from having a fair market value, although such restrictions did have the effect of depressing the fair market value of the option stock as compared to the fair market value of unrestricted, registered Glamur Products stock. Cf. Edith G. Goldwasser, 47 B.T.A. 445, 457, affirmed per curiam 142 F. 2d 556 (C.A. 2), certiorari denied, 323 U.S. 765; cf. also Thomas D. Conroy, T.C. Memo. 1958-6, where the facts are closer to those in the present case, and where the Goldwasser case was followed. On the basis of all the evidence of record, we have made a finding that the fair market value of the option stock on May 23, 1955, was 50 cents per share. [3]
*108 Cases relied upon by petitioner, such as Helvering v. Tex-Penn Oil Co., 300 U.S. 481; United States v. State Street Trust Co., 124 F. 2d 948 (C.A. 1); Schuh Trading Co. v. Commissioner, 95 F. 2d 404, 411-412 (C.A. 7); and Harold H. Kuchman, 18 T.C. 154, are distinguishable because the evidence therein was such that the restrictions placed upon the stock involved were thought to make sale thereof impossible. Having decided that the option stock had a fair market value when the options were exercised and the amount of that value, we consider next the number of shares attributable to Graham Ross for purposes of determining the amount of income it realized from receipt of the option stock. The Commissioner determined that Graham Ross is chargeable with both the 100,000 shares which it purchased and the 50,000 shares which were on option to Victorson. In this we think he erred. Although the matter may not be completely free from doubt, these two blocks of stock were dealt with separately and upon a different basis. We are reasonably satisfied that Hosid's undertaking to sell the 50,000 shares to Victorson as an individual contemplated *109 compensation to him for his own efforts in helping to bring the public offering to a successful conclusion. Accordingly, the profit growing out of these 50,000 shares must be attributed directly to Victorson; it is not chargeable to Graham Ross. That profit was thus not derived by him through Graham Ross and was therefore neither a dividend nor a deductible expense as to it. As to the 100,000 shares of option stock acquired by Graham Ross, 46,498 shares were transferred to salesmen and employees of Graham Ross as bonuses for their work in the successful underwriting. Theoretically, of course, the gross profit with respect to the entire 100,000 shares was allocable to Graham Ross which, in turn, was entitled to a deduction in respect of the 46,498 bonus shares. In substance, however, as contended by it, Graham Ross must be charged with the net profit allocable to the 53,502 remaining shares. The net result is the same. 3. The option to purchase 7,500 shares of Wilson Organic Chemicals, Inc., exercised by Graham Ross on March 8, 1955, raises some of the same questions previously discussed in relation to the Glamur Products options. In the pleadings herein, Graham Ross claimed that *110 sale of the Wilson Organic Chemicals option stock was restricted for at least 13 months when it received such stock and that such stock had no reasonably ascertainable fair market value as a result. However, no convincing evidence of any such sale restrictions in relation to the Wilson Organic Chemicals stock was offered at trial. We have made a finding that such stock had a fair market value of $1.125 per share on March 8, 1955. We hold that the Commissioner correctly determined that Graham Ross realized income on March 8, 1955, when it exercised the option to purchase 7,500 shares of Wilson Organic Chemicals stock, to the extent of the difference between the option price of 25 cents per share and the fair market value per share. However, it is entitled to deduct the value of 400 shares which it in turn transferred to Michael Scherzer for services rendered. 4. In its petition filed with this Court, Graham Ross claimed that the Commissioner erred in failing to allow it larger total business expense deductions in each of the taxable years in issue. However, at the trial Graham Ross presented no evidence with regard to its business expenses, except some general testimony in relation *111 to Victorson's services and other testimony directed to the reason the corporation transferred certain option stock to its employees. We have already ruled that the transfers of the shares of option stock (both Glamur and Wilson Organic) are deductible, and our holding that Victorson's acquisition of his 50,000 shares of Glamur stock should not be traced through Graham Ross makes moot the question whether such shares should be treated as compensation to him by Graham Ross. And our holding above that Victorson realized dividend income by the redemption of his Graham Ross preferred stock in 1955 and 1956 disposes of the claim of Graham Ross that such transactions constituted additional compensation to Victorson which are deductible by Graham Ross. There remains nevertheless Graham Ross's claim that it is entitled to further deductions on account of Victorson's services. However, it has presented no convincing evidence that it paid any other amounts to Victorson which were compensation to Victorson and which were not allowed by the Commissioner. Graham Ross has failed to prove that it is entitled to any business expense deductions, apart from those approved herein, in excess of those *112 allowed by the Commissioner during the taxable years in issue. 5. Graham Ross failed to file corporate income tax returns for its taxable years ended April 30, 1955 and 1956. The Commissioner determined that the resulting underpayment of its taxes was due to fraud, making Graham Ross subject to an addition to the tax of 50 percent for these two years under Section 6653(b) of the 1954 Code. In the alternative, the Commissioner contends that such failure was due to willful neglect and not due to reasonable cause, making the corporation subject to an addition to the tax of 25 percent for the two years in question under Section 6651(a). On the issue of fraud, the Commissioner has the burden of proof. Upon consideration of the entire record, we think he failed to prove by clear and convincing evidence that the failure of Graham Ross to file returns for its fiscal years ended April 30, 1955 and 1956 was due to fraud. While the failure to file in and of itself was some evidence of fraud, we cannot find that fraud has been proved by the necessary clear and convincing evidence in the context of *113 the record before us. However, we have made a finding on the evidence that the failures to file were due to willful neglect and not to reasonable cause. Thus, we uphold the 25 percent addition to the tax for the years ended April 30, 1955 and 1956. Neither Victorson's inexperience in running a business nor his reliance on the accountant Scherzer to file the required tax returns is, as claimed by Graham Ross, reasonable cause for its failure to file. Victorson admitted that he was aware of his responsibility as president of the corporation to see that income tax returns were filed. Delegation of this responsibility to an accountant, particularly one who is not a certified public accountant, cannot furnish either Victorson or Graham Ross with a reasonable cause for a failure to file corporate income tax returns. This is not a case of reliance upon the advice of an expert that it was not necessary for the corporation to file returns. Cf. Haywood Lumber & Mining Co. v. Commissioner, 178 F. 2d 769 (C.A. 2), modifying 12 T.C. 735. This is a case of knowing of the statutory *114 requirements and failing to see that they were in fact carried out. [4] In the circumstances, we think it clear that the failure of Graham Ross to file the returns in question was due to willful neglect and was not due to reasonable cause. Decisions will be entered under Rule 50. Footnotes
1. On brief petitioners suggest that a different rule may apply in the present case to an underwriter which receives a stock option as part of its compensation for services rendered than in the more usual case of an employee receiving such an option. However, petitioners do not suggest what this different rule should be nor why it should be different. Given the same options in both situations, we know of no reason why an independent contractor should be treated differently from an employee with regard to the realization of income upon the exercise of a compensatory stock option. See Rev. Rul. 62-49↩, 1962-1 C.B. -.
2. As noted in the findings, although the underwriting agreement set a 12-month restriction on public sale, the notification to the S.E.C. and the offering circular referred to it as a 13-month restriction. The reason for this change is not explained in the record. ↩
3. It should be noted that in making this valuation we are not dealing with the value of a single block of 150,000 shares. In the first place, as more fully pointed out hereinafter, there were originally two separate blocks, in the amounts of 100,000 shares and 50,000 shares, owned by Graham Ross and Victorson, respectively. In the second place, the valuation of only 53,502 shares out of Graham Ross's 100,000 shares is involved as to it, since it gave 46,498 shares to salesmen and employees as a bonus. And in the third place, it must be remembered that the corporation's 53,502 shares and Victorson's 50,000 shares could each be the subject of more than a single private sale. Nevertheless, we are cognizant that such sales could probably have been made only in larger blocks than are customarily sold in public sales, and we have taken this blockage factor into account in making our finding as to value.↩
4. Although there is a vague suggestion in the testimony of Victorson that Scherzer's failure to file income tax returns for Graham Ross and his failure to supply Victorson with financial statements both may have been part of some deliberate conspiracy to injure Victorson and the corporation, we can make no finding in this regard on the basis of the evidence presented. Scherzer was deceased at the time of trial, and Victorson's assertions concerning the alleged conspiracy were not at all clear. Therefore, we do not decide the question whether tortious conduct on the part of an employee which is directly related to a failure to file a return may constitute reasonable cause for such failure under the statute.↩