Samuel S. Silverman and Norma B. Silverman v. Commissioner.Silverman v. CommissionerDocket Nos. 4572-64, 5405-65.United States Tax CourtT.C. Memo 1968-216; 1968 Tax Ct. Memo LEXIS 81; 27 T.C.M. (CCH) 1066; T.C.M. (RIA) 68216; September 26, 1968. Filed George P. Williams III, 1719 Packard Bldg., Philadelphia, Pa., for the petitioners. Max J. Hamburger, for the respondent. RAUMMemorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies in petitioners' income taxes: Docket No. 4572-64YearDeficiency1959$12,221.46196010,340.06196115,112.81196216,664.15Docket No. 5405-65196312,293.88 Petitioners have paid the 1962 deficiency and are seeking refund thereof in a Federal district court. The deficiencies for the remaining years are being challenged herein. The sole issue involves the fair market value of 148 paintings donated by petitioners to various qualified institutions under section 170, I.R.C. 1954. Findings of Fact The stipulation and supplemental*82 stipulation of facts filed by the parties, together 1067 with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Samuel S. Silverman and Norma B. Silverman are husband and wife and at all times relevant resided in Philadelphia, Pennsylvania. They filed joint income tax returns for the years involved with the district director of internal revenue at Philadelphia. Samuel Silverman (hereinafter sometimes referred to as "Silverman") is chairman of the board and past president of Silco Cut Price Stores, a chain of some 74 retail junior department stores located in small towns in the Middle Atlantic states. Silverman began to buy paintings as a hobby in 1949. At first he bought some paintings by American artists, but shortly thereafter began to acquire the works of artists who were painting primarily in France. He went to Europe on business annually from 1949 through 1961, and would buy paintings on such occasions. Since 1961 he has traveled to France twice a year, buying paintings on each such visit. The paintings which he purchased were inexpensive and were generally those of young living artists. They did not include any masterpieces or outstanding*83 works of great value. He bought about 85 percent of his paintings from two dealers, Armand Drouant and Paul Hervieu, each of whom operated well established galleries, Drouant in Paris and Cannes, and Hervieu in Nice. Hervieu also painted under the name of "Sanh". Drouant conducted an art school in connection with his gallery. He had a practice of "sponsoring" artists, whereby he would take on a promising artist as a pupil and assume his living expenses with the understanding that Drouant would have the first opportunity to purchase the artist's entire output of paintings. Hervieu had somewhat similar arrangements with aspiring artists, whose living expenses he paid, but it is not clear whether he, like Drouant, also gave them instruction. A number of the artists whose works are involved in this case had thus been sponsored by Drouant or Hervieu. Drouant met the Silvermans in about 1949. He introduced them to artists and entertained them socially. Silverman purchased a number of paintings from Drouant's gallery during each of his visits to France, particularly paintings by the following artists involved in this case: Baboulene, Bleny, Coignard, Darnaud, Ganne, Marchand des Raux, *84 Porcher, Priking, Ripolles, Trevedy, Ubeda, Vo-Lang, and Voyet. Drouant also sold paintings to other dealers on a wholesale basis at a discount of 15 percent from the established retail price. Silverman's purchases from Drouant were also at less than the established retail price. Hervieu similarly sold a large number of paintings to Silverman, at less than the established retail price; his discount to dealers was 30 percent. Among the paintings purchased by Silverman from Hervieu were the works of the following artists involved in this case: Atlan, Baboulene, Coignard, Goetz, Marchand des Raux, Papart, Sanh and Venard. Silverman first made charitable gifts of his paintings in 1958. At that time he had little room left in his house or office for more paintings. A friend suggested giving some paintings to a local home for the aged; Silverman's daughter suggested giving some to a hospital where she worked. These gifts were made. In New York City, Silverman met a collector who suggested a donation to a museum in San Diego, which was made. Through this donation Silverman met Victor Hammer (hereinafter sometimes referred to as "Hammer"), who has been a New York art dealer and appraiser*85 for 40 years. Hammer made the appraisals upon which the claimed deductions at issue in this case were based and guided Silverman greatly in expanding his program of making charitable gifts of his paintings. Silverman began to get appraisals of his art collection about 1958, the first of which was made by the Newman Gallery in Philadelphia. Hammer made his first appraisal of the entire Silverman collection in 1959, and thereafter made an appraisal of the entire collection annually. He prepared his first master list of the collection in connection with his 1960 appraisal. The coverage of a fine arts insurance policy maintained by Silverman was based upon these various appraisals, but the insurance company made no independent check of the appraisals. In making his first appraisal, Hammer came to the Silverman home and examined each painting individually. This took about a day or less of his time. In making his successive annual valuations, Hammer would delete from the master list those paintings that had been given away during the preceding year and would appraise and add new acquisitions. He ordinarily did not disturb the valuation of the paintings that remained from the previous*86 year unless some event, like the death of a particular artist, prompted him to make an upward revision in respect of the works of that artist. His fee for each annual appraisal was about $500. Whenever 1068 Silverman made a charitable gift of paintings to a particular donee Hammer would prepare a separate document in an affidavit form relating to the paintings thus given, identifying each painting and setting forth an appraisal of each painting comprising the gift. The valuation thus set forth was based solely on the master list and did not involve any further efforts by Hammer to determine the value of any of those paintings. For his services in connection with each such gift Hammer received a further fee equal to a percentage of his valuation of the paintings donated. Hammer's appraisals were purportedly based upon what he thought he could sell the paintings for in New York City, the principal market for works of art in the United States. Most of the artists represented in the Silverman collection were unknown to Hammer prior to his contact with the Silvermans. Silverman supplied Hammer with certain biographical and other data concerning the artists, but Hammer made no inquiry*87 into the prices which Silverman actually paid for the paintings. Hammer regarded such prices as irrelevant. However, Hammer acquired some knowledge through an associate as to the general level of Paris prices of paintings by the artists involved; that associate traveled to France frequently, and at Hammer's request, made inquiries in Paris about such prices and reported his findings to Hammer. Although there was a market in New York for paintings in the general range of $300 to $1,500 - the range within which most of Hammer's valuations fell - there was no established market in New York for most of the artists involved in this case. These artists appear to have been largely unknown in the United States during the tax years. During the tax years Silverman donated 148 paintings to the following 22 institutions, each of which qualified for tax deductible contributions under section 170 of the Internal Revenue Code of 1954: 1. Fairleigh Dickinson University Rutherford, N.J. 2. Brandeis University Waltham, Mass.3. Colgate University Hamilton, N. Y. 4. National Arts Foundation New York, N. Y. 5. Wilmington College Wilmington, Ohio6. The Fine Arts Gallery*88 of San Diego San Diego, Cal.7. Glassboro State College Glassboro, N.J.8. University of Pennsylvania Law School Philadelphia, Pa. 9. Peabody Teacher's College Nashville, Tenn. 10. Women's Hospital of Philadelphia Philadelphia, Pa. 11. Franklin & Marshall College Lancaster, Pa.12. Isaac Delgado Museum New Orleans, La.13. New Mexico Art Museum Santa Fe, N.M.14. University of Minnesota Minneapolis, Minn.15. Historical Society of Montana Helena, Mont.16. Phoenix Art Museum Phoenix, Ariz.17. University of AlabamaTuscaloosa, Ala.18. Lenox Hill Hospital New York, N. Y.19. Tougaloo Southern Christian CollegeTougaloo, Miss. 20. Mississippi College Clinton, Miss. 21. University of the South Sewanee, Tenn.22. Belhaven College Belhaven, Miss.Silverman chose the paintings to be donated, and Hammer suggested or selected many of the donees. Hammer knew a large number of officers, directors, or curators of museums, or other institutions to which gifts of paintings or art objects could be made, and he arranged for such gifts not only on behalf of Silverman but also on behalf of a number of other clients. He thus rendered a "package" service, appraising*89 the paintings in the first instance and then arranging for and carrying through the making of the gifts. In connection with each gift by Silverman there was an affidavit signed by Hammer setting forth the "fair replacement" value of the paintings donated, based on the master list, as heretofore noted. Hammer would write to the donee, informing it of the forthcoming gift by Silverman and enclosing a copy of the valuation affidavit. In such letter, Hammer set forth as a condition of the gift, as required by Silverman, that the donee agree not to dispose of the paintings for a three-year period. The donees agreed to this condition. In a number of cases the letter requested the donee to state, in 1069 acknowledging receipt of the gift, that "We have had these paintings professionally appraised as follows" and thereupon to list the various items in the Hammer appraisal. Some of the donees complied with this request. The following schedule shows, by year and by artist, the number of paintings and their claimed values (as determined by Hammer) at the time of their donation as charitable contributions during the years in issue: Values claimed for donated paintings, by artist195919601961ArtistNo.ValueNo.ValueNo.Atlan1$ 900Baboulene22,1002Bleny13752850Borsato1411,20021,600Brion125028504Coignard42,6507Daderian26501Darnaud52,15074,6001de GranamaisonDuncan21,800EmanuelsonGanne11,500Goetz135021,1004Hardy1Marchand des RauxPapart21,00017502Porcher1Priking15001Ripolles1RosendahlSanh125052,6502Tanaka1Trevedy2Ubeda21,3004Venard1Vo-LangVoyet19501Will1750Total34$21,87529$19,20036*90 Values claimed for donated paintings, by artist1963TotalArtistValueNo.ValueNo.ValueAtlan1$ 900Baboulene2,10044,200Bleny31,225Borsato1612,800Brion1,450125082,800Coignard5,45043,4501511,550Daderian40031,050Darnaud75021,800159,300de Granamaison21,20021,200Duncan170032,500Emanuelson31,00031,000Ganne11,500Goetz2,700145084,600Hardy4001400Marchand des Raux18001800Papart1,10021,75074,600Porcher5001500Priking65096,700117,850Ripolles750160021,350Rosendahl26002600Sanh1,15063,750147,800Tanaka90042 ,55053,450Trevedy1,40021,400Ubeda3,60055,2001110,100Venard1,80011,800Vo-Lang41,60041,600Voyet95011,00032,900Will1750Total$26,05049$33,400148$100,525 1070 At least since 1962 Silverman and his representatives were aware that the Government, in checking on his charitable donations, was seeking information*91 as to the actual prices that he had paid for paintings that were the subject of his gifts. No such cost data were ever presented to the Government by petitioner or on his behalf prior to the litigation concerning his charitable deductions, and representations were made on his behalf that he had retained no such data. However, both Drouant and Hervieu kept records of their sales to Silverman, and since 1962 Silverman has gone to Europe twice each year and has been in contact with both Drouant and Hervieu; yet he made no request of either of them for copies of invoices or other documents showing the actual cost of the paintings which he had previously purchased from them. Both Drouant and Hervieu came to the United States and testified as witnesses for petitioners at the trial of this case in January 1968, but neither of them brought with them any records as to the prices actually paid by Silverman for the paintings which he bought from them, nor were they requested to bring any such records with them by Silverman or his representatives. The Government, however, has assembled a large number of documents obtained from the Bureau of Customs relating to the importation of paintings by*92 Silverman from 1957 to 1965. These documents include invoices showing the purchase prices of a large number of paintings acquired by Silverman from Drouant, Hervieu and others. After introduction of these documents in evidence, the petitioners presented in evidence copies of some invoices obtained from their customs broker which showed actual cost data, but these were largely merely copies of some of the same invoices already before the Court. In general, the invoices before the Court show the artist's name, the size of the painting, and identifying title, and the selling price. At least 27 of the donated paintings involved in the case can be identified with reasonable accuracy in the invoices. The following schedule relating to these 27 paintings shows, by year and by artist, the date of purchase, the date of gift, the actual cost to Silverman, and the claimed value (as determined by Hammer) of each such painting, as well as the approximate ratio of actual cost to claimed value: 1*93 1071 ArtistDate ofDate ofActual CostClaimedRatio of cost toPurchaseGiftValueClaimed Value1959Brion1-23-585-15-59$ 23.76$ 2501:10Coignard11-25-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.547501:8.5Sanh1-23-58*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.252501:161960Baboulene9-19-581- 6042.871,1001:26Baboulene2-14-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.451,0001:40Brion7-7-584- 6023.815001:20Darnaud7-6-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.601,0001:11Sanh9-19-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.726001:17Sanh9-19-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.53800 1:13Sanh9-19-584-5-6047.626501:13Sanh1-23-58*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.252501:161961Baboulene7-7-583-1-6135.729001:25Brion6-6-592-8-6136.713501:9Coignard1-30-6110-26-6181.617501:9Coignard1-25-602-8-6 150.908001:16Coignard9-20-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.836501:7Papart1-21-6010-21-6161.085001:8Sanh1-26-6110-2 6-6176.518501:11Venard2-14-59*112-8-61122.271,8001:131963Brion7-7-5811-18-6314.292501:16Co ignard2-8-635-31-63122.671,1001:9Coignard8-16-604-8-6373.468001:10.5Sanh1-17-6212-6-6320.882001:10Sanh9-25-6211- -6345.926001:13Sanh1-17-6211-26-6320.885501:26Ubeda3-2-606-7-63263.621,2001:4.5Ubeda3-2-6011- -63236.201,2001:5*94 During the tax years the level of prices in New York was somewhat higher than in Paris; thus a painting comparable to one that might sell in New York for $1,000 would sell in Paris for about $800 or $850. In addition to data on the above 27 paintings, the customs documents and invoices contain a mass of additional actual cost data in respect of works by artists involved in this case. From these it is possible to make reasonably accurate estimates of the actual cost to Silverman of a majority of the remaining paintings donated during the tax years. Further, by the use of averages in respect of paintings for which there are specific cost data, it is possible to estimate the cost of the remaining paintings. The following table shows in the aggregate, by year, the total claimed value of the donated paintings used by petitioners in determining the amount of their deductions for charitable gifts and the approximate cost of these paintings to Silverman: YearNo. ofTotal ClaimedApproximate CostPaintingsValuationsDonated195934$ 21,875.00$ 3,262.0719602919,200.001,686.9319613626,050.003,413.0019634933,400.005,225.00148$100,525.00$13,587.00*95 As revealed in the invoices which were part of the customs documents previously referred to, there appears to be a trend of increased prices about 1962 and 1963 over prices paid during 1959 and 1960 in respect of the paintings of some of the artists, taking into account the size of the particular paintings. Also, the fair market value of paintings generally has increased since 1963, and the prices paid for paintings since 1963 are relevant here only after giving appropriate consideration to the extent to which such appreciation in value is taken into account. In determining the deficiencies herein the Commissioner in effect disallowed the entire deduction for charitable contributions as to each year to the extent that it included any amount in respect of the gifts of paintings. The aggregate fair market values, by year, of all paintings donated by Silverman, determined as of the time of the respective gifts, were as follows: 1959$ 5,80019604,20019617,500196313,000 These amounts must be taken into account in computing petitioners' deductions for charitable contributions. Opinion RAUM, Judge: The sole issue in this case is the fair market value*96 of the 148 paintings donated during the tax years 1959, 1960, 1961 and 1963. The paintings were the products of 28 painters, most of them young living artists who were working in France; about 85 percent of the paintings had been purchased by Silverman from two well established French dealers, Drouant and Hervieu. Although the paintings were not masterpieces or works of unusual value, they were produced by serious professional artists. It appears that these artists were largely unknown in the United States, and there was no established market for the paintings of most of them in this country, notwithstanding that there was generally a market for paintings in the $300 to $1,500 range - the range which included the values claimed by petitioners for most of the paintings involved. The burden of proving the claimed values was of course on the petitioners, and they have undertaken to discharge that burden primarily by Victor Hammer's valuations plus certain other evidence. The Commissioner originally refused to allow any deduction in respect of these paintings on the theory that no market value whatever had been shown, but on brief he argues that the allowable deduction should be limited*97 to the established cost of the paintings contributed. Upon the basis of the evidence before us we were able to make findings as to the approximate cost of all of the paintings, as well as the precise cost of 27 of those paintings which were identified with particular donations. As to those 27 paintings, the ratio of Silverman's actual costs to Hammer's valuations ranged from approximately 1:4.5 to 1:40; and the average time that elapsed between Silverman's purchase of those paintings and his donation thereof was approximately 21 months. 2 1073 The question presented is solely one of fact, and our findings as to the values of the paintings, by year, are dispositive of the case. The values thus found are substantially below Hammer's valuations, which were claimed on petitioners' *98 returns; on the other hand, they also reflect our conclusion that the fair market value in the United States at the time of the respective gifts was considerably higher than Silverman's costs. It has obviously not been possible to set forth in our findings all the evidence upon which we base our ultimate conclusions, nor would any useful purpose be served by an extensive review of all the materials that we took into account in reaching those conclusions. However, we do think it appropriate to comment upon several aspects of this case. The cornerstone of petitioners' case was Hammer's valuations. Hammer was a witness before us. We had ample opportunity to observe him and to draw inferences as to his reliability, taking into account also various letters in evidence which he had written. Although it was clear that he was knowledgeable in the field of art generally, we had no confidence in his valuations, which appeared to be highly inflated. He impressed us as a cynical person with flexible scruples. An example of his conduct which troubled us was the request that he made of some donees that they include in their letter of receipt a statement reading "We have had these paintings professionally*99 appraised as follows" and then to set forth Hammer's appraisal of the items involved. Any such letter of acknowledgment would be highly misleading, in that it would raise a reasonable, but false, inference that the donee had obtained an independent appraisal. Petitioners sought to bolster Hammer's valuations with the testimony and valuations of a Philadelphia art dealer named Robert Carlen. Carlen was familiar with the work of only a few of the 28 artists involved. He appraised 93 of the paintings, 52 of them from photographs. His valuations roughly paralleled those of Hammer, but after listening to Carlen's testimony we did not find his valuations reliable. On several occasions he gave or started to give spontaneous answers that he backed away from when it became evident that they might be harmful to petitioners' case. At one point, when asked whether it wouldn't be important to know what a donor paid for a painting which he had acquired from a reputable gallery six months earlier, he started to reply "You are perfectly - well, what he paid for it?" This was then followed by highly confused answers, in which he attempted unsuccessfully to extricate himself. Plainly, as argued by*100 the Government, Carlen was on the verge of giving an honest spontaneous answer: "You are perfectly correct." At another point, he testified that "there was not a great discrepancy" between New York and Paris prices, and that a painting comparable to one selling for $1,000 in New York could be bought for $800 or $850 in Paris. 3 Only later did he begin to qualify these answers, building up a bigger gap between New York and Paris prices. We found his original answers more convincing. The matter of Silvermant's costs has been the focal point of considerable controversy between the parties. At first, during the audit of the returns petitioners professed not to have any cost data, a position sharply challenged by the Government. But whether that position was technically accurate - on which we have made no finding 4 - Silverman certainly had access to cost data which could have been supplied. 5 In any event, even though the burden was not on the Government in this respect, it has presented a great mass of materials obtained from the Bureau of Customs*101 showing actual prices paid by Silverman for a large number of paintings purchased during the years 1957-1965. And by painstaking correlation of 1074 these materials the Government has presented to this Court helpful detailed charts identifying, wherever possible, a particular purchase with a particular donation. Petitioners have not objected to the correctness of these charts, and we have based some of our findings thereon. Moreover, even where it was not possible to identify a particular purchase with a particular donation, petitioners' brief states: For the purposes of this proceeding the Silvermans accept the prices shown by the invoices in evidence as being representative of the prices they paid for the paintings involved in the case, and that has been their position from the beginning, when their counsel so informed the Court in his opening statement. *102 Accordingly, in reliance upon the materials before us, we have made findings as to the aggregate cost of the paintings donated during each of the years in issue, and we have accepted in this connection the figures proposed by the Government, which have not been challenged by petitioners. Cost figures alone, however, do not establish fair market value. But they are a significant starting point, to which relevant adjustments may be made. Thus, an important consideration is our conclusion that Silverman bought his paintings, at least those from Drouant and Hervieu, at less than prevailing market prices in France. But we did not believe the testimony of either of those dealers that their prices to Silverman were at only one-half to one-third of the established prices. Both of them sold paintings to other dealers at wholesale, Drouant at a 15 percent discount and Hervieu at a 30 percent discount, and we do not believe that Silverman received price concessions that were so much more favorable than those available to dealers. Nevertheless, we think that he did receive some price concessions and we have taken this conclusion into account in making our ultimate findings. Drouant and Hervieu*103 each gave testimony in general terms as to the range of prices that each received during the taxable years for the works of some of the artists in volved herein. And there was presented in evidence a 1966 price list from Drouant's gallery in respect of certain paintings which included works by some of those artists. Neither of these dealers brought with them any specific data as to the actual sales, and the evidence thus presented by them was less than satisfying in the context of this case. Moreover, serious doubt was cast upon Drouant's testimony in respect of the alleged sharp reduction in prices which he gave to Silverman when one examines certain of the customs documents in evidence. In these documents, executed by Drouant's gallery representations were made that the prices at which specifically identified paintings were sold to Silverman were the prices which the gallery was "now selling the goods or offering them for sale for home consumption, including all applicable taxes", that such prices were "freely offered to anyone who wishes to buy the goods for home consumption", and that such prices were "freely offered to anyone who wishes to buy the goods for export to the United*104 States." Another factor relevant to fair market value is the fact that price levels in the United States were higher than in France. It was not possible to fix a precise relationship between Paris and New York prices, but we are fully satisfied that New York prices were ordinarily not as much as three times Paris prices for comparable paintings, as has been suggested on behalf of petitioners. We do think they were in general higher to some extent and we have taken this factor into account. Further bearing on the fair market value of the paintings in issue is a limited amount of evidence as to prices actually paid in the United States for paintings by some of the artists involved. While we have given weight to this evidence, it is subject to certain infirmities. Two of the artists are Atlan and Venard, whose works began to increase sharply in value after 1959 or 1960. Also, it is difficult to relate the prices thus paid to the paintings donated by Silverman. We have no reasonably satisfying way of knowing whether the Silverman paintings were of like quality. The evidence before us shows, for example, that there was a wide variation in the quality of paintings by Venard, and the*105 one Venard that was donated by Silverman was characterized by the curator of the donee museum as "particularly distasteful." As to some of the other artists involved, the evidence of actual sales must be evaluated with caution not only by reason of possible differences in quality, 6 but also because there were 1075 possible differences in comparable price levels due to increases in value after 1962 or 1963. In addition to the evidence of some actual sales there was also some evidence of offers to sell, which is subject, a fortiori, to the same infirmities. We have nevertheless attempted to give some weight to such evidence. In the case of several donee institutions, the evidence shows that some of the paintings were resold at "Treasure" sales or "Tent" sales or at auction at prices dramatically below Hammer's valuations, indeed at prices not very far removed from Silverman's cost. The Government relies upon these sales. However, *106 the prices obtained on these occasions appear to have been largely in the nature of "distress" prices and we cannot give much weight thereto. Another consideration affecting the fair market value of Silverman's donated paintings is the condition that he imposed whereby the donee agreed not to sell or dispose of the paintings for a three-year period. This restriction certainly had an adverse effect on fair market value. As we said in Jacob J. Cooley, 33 T.C. 223, 225, affirmed 283 F. 2d 945 (C.A. 2), "* * * property otherwise intrinsically more valuable which is encumbered by some restriction or condition limiting its marketability must be valued in the light of such limitation." Petitioners are quite correct in contending that a restriction against sale or other disposition of a painting for a fixed period is not of as great importance as a like restriction in respect of securities or other property of rapidly fluctuating value. Cf. Edward C. Victorson, 21 T.C.M. 1238,*107 affirmed 326 F. 2d 264 (C.A. 2). But, contrary to petitioners' position, we think it is more than of negligible significance, and we have given weight to this factor in making our ultimate findings. We take note of another matter that emerged in the evidence presented. The Silvermans have two married children to whom they from time to time made gifts of a number of paintings executed by some of the same artists involved herein. In determining whether they had made gifts to each donee in excess of $6,000 in any one year so as to require the filing of annual gift tax returns, Silverman valued these paintings at his own cost, in contrast to his valuations of many times cost of other comparable paintings when claiming the income tax deductions sought herein. 7 Such double standard is hardly reassuring in the context of this case. We need not prolong this opinion further. We have taken into account the entire record, and our ultimate findings reflect our best judgment on all the evidence before*108 us. Decision will be entered under Rule 50. Footnotes1. The identification of these paintings and the data with respect thereto were included in charts presented by respondent in proposed findings of fact that were not objected to by petitioners.↩2. Moreover, since petitioners admitted that the cost data in evidence were representative of the prices paid for all the paintings in issue, without regard to the time of acquisition, it would appear that the lapse of time between acquisition and gift is not particularly important in determining fair market value at the time of gift to the limited extent that the cost of the paintings is at all relevant.↩3. When asked whether it could be bought in Paris for $100 he replied "No, my God, no. That is absurd. That is utterly absurd."↩4. However, Silverman's insistence that he in fact had not retained any invoices or other documents showing cost data does not appear to be entirely convincing in view of other evidence indicating that he followed a practice of meticulous record keeping and record retention. ↩5. Petitioners have raised a false issue in respect of keeping records of the costs of the various paintings in issue. They point out that T.D. 6785, 1965-1 C.B. 117, requiring that cost data be furnished in connection with certain charitable gifts was made applicable only to years beginning after December 31, 1963. But this is wholly irrelevant here. T.D. 6785 deals with materials that taxpayers are required to submit with their income tax returns. Thus, for tax years prior to 1964, petitioners may not have been under a duty to submit cost data in the first instance at the pain of disallowance. But where cost data are relevant, and where the taxpayer has the burden of proof but persistently refuses to make such data available without reasonable explanation for such failure, it may be proper to draw appropriate inferences from such failure, regardless of T.D. 6785↩. However, cost data have been supplied herein to a considerable extent by the Government, and to this extent the matter has thus in any event become moot.6. Our doubts as to quality are enhanced by evidence that Silverman purchased paintings in relatively large quantities, giving primary attention to size and price in respect of each artist rather than to the quality of the particular paintings.↩7. Another instance in which Silverman's paintings were valued at cost involved a claim filed against the Italian Line for damages caused to two paintings while in transit.↩