Jackie L. and Janet G. McDONALD,
Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.

No. 83–4588.

United States Court of Appeals,
Fifth Circuit.

June 28, 1985.

Glenn L. Archer, Asst. Atty. Gen., Gary
R. Allen, Kenneth L. Greene, Tax Div., U.S.
Dept. of Justice, Fred Goldberg, Chief
Counsel, John Menzel, IRS, Henry G. Sala-
my, Chief Branch, No. 4, Tax Litigation
Div., Michael L. Paup, Chief Appellate Sec-
tion, Dept. of Justice, Washington, D.C.,
for respondent-appellant.

David G. Glickman, Richard A. Freling,
Dallas, Tex., for petitioner-appellees.

Before RUBIN, POLITZ, and GAR-
WOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is an appeal by the Commissioner of
Internal Revenue from a judgment of the
United States Tax Court holding invalid
Treasury Regulation section 1.57–1(f)(3),
which makes the standard of "fair market
value ... determined without regard to any
[lapse] restriction" contained in Internal
Revenue Code ("Code") section 83 applica-
ble, for purposes of the minimum tax im-
posed on items of tax preference, to valua-
tion under Code former section 57(a)(6)
(1969) of stock acquired by exercise of a
Code section 422 qualified stock option.
We conclude that, absent a clear indication
in the language of section 57(a)(6) or in its
legislative history that Congress intended
otherwise, the settled meaning of the term
"fair market value" should not be thus
disturbed, and that, by applying section 83
rules to section 57(a)(6), the Commissioner
exceeded his statutory authority. Accord-
ingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

The parties stipulated to facts which we here summarize. Appellees Jackie L. McDonald and Janet G. McDonald, husband and wife, reside in Dallas, Texas; it is their 1972 tax return which is the subject of controversy here.

At all times pertinent, appellee Jackie McDonald ("McDonald") was an employee of Centex Corporation ("Centex"). On December 3, 1968, Centex adopted a qualified stock option plan meeting the then requirements of Code ("IRC") section 422.[1] On February 3, 1969, pursuant to this plan, McDonald was granted an option to purchase 3,500 shares of Centex common stock at an option price of $19 per share.[2] On September 2, 1969, also pursuant to the plan, McDonald was granted a second option, to purchase an additional 2,000 shares at an option price of $28.50 per share, presumably the then market price of Centex stock. Centex common stock split several times during 1971 and 1972. As a result, McDonald became entitled to purchase up to four times the originally designated number of option shares at an exercise price per share of one-fourth that quoted in the original option agreements. On September 25, 1972, McDonald exercised a portion of both options: under the first, he purchased 7,000 shares at a price of $4.75 per share (total: $33,250); under the second, he purchased 4,000 shares at $7.125 per share (total: $28,500). On September 25, 1972, Centex common stock sold on the New York Stock Exchange for $25.75 per share.

The shares purchased by McDonald by his exercise of these qualified stock options were not registered with the Securities and Exchange Commission ("SEC"). McDonald was required to execute an "investment letter" when he exercised the options, which, under SEC rules and decisions, limited transferability of the acquired shares within an initial two-year holding period.[3] As a result of these transferability restrictions, the fair market value of this "lettered" Centex stock on the September 25, 1972 date of option exercise was $18.025 per share.

For calendar year 1972, appellees paid a section 56(a) minimum tax in connection with the exercise of these stock options as provided by section 57(a)(6), which listed as an item of tax preference, in case of acquisition during the tax year "of a share of stock pursuant to the exercise of a [section 422] qualified stock option ... the amount by which the fair market value of the share at the time of exercise exceeds the option price." Appellees calculated the tax preference amounts on the option purchases to be $136,525, this being the excess of $198,275 (the aggregate value of the stock purchased under both options, valued at $18.025 per share) over the total purchase price of $61,750.

---

**1.** IRC section 422(b), 26 U.S.C. § 422(b) (1964), sets out the requirements for qualified employee stock option plans. A minimum holding period of three years following the exercise of such a stock option is required in order to qualify for IRC section 421(a) preferential tax treatment. 26 U.S.C. § 422(a)(1) (1964).

**2.** This option price represented the public offering price of Centex stock by underwriters pursuant to a registration of Centex common stock with the Securities and Exchange Commission on December 5, 1968. The option shares themselves, however, were not registered.

**3.** SEC Rule 144, 17 C.F.R. § 230.144, generally provides, *inter alia,* that unregistered stock may not be sold publicly within two years of its acquisition, 17 C.F.R. § 230.144(d)(1), unless it is first registered with the SEC. *See* 17 C.F.R. § 230.144(b). Rule 144 does not normally pro-

hibit private placement sales or pledges of such stock, however, although the restrictions on transferability apply also to the transferees or assignees. *See* 17 C.F.R. § 230.144(a)(3). After the two-year holding period has passed, such stock may generally be sold publicly whether registered or not.

McDonald's "investment letter" indicated that he agreed not to sell or transfer the stock unless it had been registered or Centex received an opinion from counsel to the effect that registration was not necessary. *Cf. Estate of Gresham v. Commissioner,* 752 F.2d 518, 519 (10th Cir. 1985). McDonald's stock certificates were clearly marked by restrictions appearing on the face of the certificates that indicated their nonregistration and the presence of the transfer restrictions.

In 1978, the Internal Revenue Service ("IRS") sent appellees a statutory notice of deficiency, which the parties have stipulated was timely, alleging underpayment of the minimum tax on these option purchases. The IRS valued the stock for purposes of section 57(a)(6) at the $25.75 per share New York Stock Exchange price effective on the date of exercise, not at the then $18.025 per share value used by appellees. The latter value took into account, as the IRS valuation did not, the effect of the "lettered stock" transferability restrictions on the stock's fair market value. The IRS arrived at its valuation by applying Treasury Regulation ("Reg.") section 1.57–1(f)(3), 26 C.F.R. § 1.57–1(f)(3) (1978), which provides that, for purposes of section 57(a)(6), the fair market value of such qualified option stock must be determined without regard to restrictions other than those which by their own terms do not lapse ("nonlapse restrictions").[4] This valuation standard and the language embodying it were borrowed from section 83 and applied by this regulation to the section 57(a)(6) computation, for purposes of the section 56 minimum tax, of the item of tax preference arising from the exercise of a qualified stock option.[5]

Appellees petitioned the Tax Court for a redetermination of the deficiencies asserted by the Commissioner. That court characterized the case as containing a "sole issue for decision ... whether certain Federal securities law restrictions imposed on the transfer of common stock received by an employee upon the exercise of a qualified stock option should be considered in determining the fair market value of the stock for purposes of the minimum tax computation." *McDonald v. Commissioner*, No. 1983–197 (T.C. April 11, 1983), at 6. The Tax Court ruled in favor of the McDonalds. It felt itself bound by its prior decision in *Gresham v. Commissioner*, 79 T.C. 322 (1982), *aff'd*, 752 F.2d 518 (10th Cir.1985),[6] which held Reg. section 1.57–1(f)(3) invalid, and specified that, for minimum tax purposes, similar lapsing restrictions on the transferability of stock acquired by exercise of a qualified stock option may not be wholly disregarded in determining the stock's fair market value when so acquired. The Commissioner appeals to this Court.

## THE LEGAL FRAMEWORK

### *The Minimum Tax*

Section 56 of the Internal Revenue Code was enacted as a part of the Tax Reform Act of 1969. As enacted and as in effect in 1972,[7] it imposed a so-called minimum tax

---

**4.** The parties agree that the restrictions on transferability of the lettered stock here in question were restrictions which by their terms *would* lapse. *See* Reg. § 1.83–3(h), (i) (defining nonlapse and lapse restrictions).

**5.** Section 57(a)(6) uses the term "fair market value" without qualification, in contradistinction to section 83's express command to determine fair market value without considering any lapsing restrictions. Regulation section 1.57–1(f)(3) itself recites that the valuation is to be performed "in accordance with the principles of section 83(a)(1)."

**6.** The *Gresham* case was on appeal in the Tenth Circuit at the time the appeal here was brought.

**7.** Section 56 was added to the Code in 1969. *See* Tax Reform Act of 1969, Pub.L. No. 91–172, § 301(a), 83 Stat. 487, 580 (1969). As amended in 1971 and as in effect in 1972, it provided in pertinent part:

"§ 56. Imposition of tax

"(a) In general.—In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year, with respect to the income of every person, a tax equal to 10 percent of the amount (if any) by which—

"(1) the sum of the items of tax preference in excess of $30,000, is greater than

"(2) the sum of—

"(A) the taxes imposed by this chapter for the taxable year ... [and]

" ....

"(B) the tax carry overs to the taxable year."

In 1978, section 55 was added to the Code. *See* Pub.L. No. 95–600, § 421(a), 92 Stat. 2871 (1978). Section 55 imposes an "[a]lternative minimum tax for taxpayers other than corporations" that is similar to the minimum tax previously imposed on individuals by former section 56. The section 55 tax is also geared to the section 57 items of tax preference. *See* § 55(b). In 1982, Congress made section 56 applicable only to corporations and further amended section 55. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 201, 96 Stat. 324, 411–21 (1982).

on certain "items of tax preference," as listed in IRC section 57. Section 56 levied a tax, additional to all other taxes, in an amount equal to ten percent of the excess of "the sum of the items of tax preference" listed in section 57 over the sum of $30,000 plus the taxpayer's regular income tax liability (subject to certain adjustments) apart from the section 56 tax itself.[8] Section 57(a) as relevant here provided that, for purposes of section 56, "the items of tax preference are," and listed several different items, including:

"(6) Stock options.—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the *fair market value* of the share at the time of exercise exceeds the option price." (Emphasis added.) [9]

The term "fair market value" is not defined in either section 56 or section 57. In fact, it is not defined anywhere in the Code. However, Reg. section 1.57–1(f)(3), at issue here, provides, for purposes of section 57(a)(6):

"(3) Fair market value. In accordance with the principles of section 83(a)(1), the

fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be *determined without regard to restrictions* (other than nonlapse restrictions within the meaning of § 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised." (Emphasis added.)

Section 83 of the Code, referred to in Reg. section 1.57–1(f)(3), was enacted as part of the Tax Reform Act of 1969, as were sections 56 and 57. Section 83 is not directed particularly to the exercise of compensatory options, stock or otherwise, but is generally applicable to all transfers of property "in connection with the performance of services ... to any person other than the person for whom such services are performed." [10] It provides that with respect to such a transfer there "shall be included in the gross income of the person who performed such services" the amount by which any payment for the transferred property is exceeded by

"the fair market value of such property (*determined without regard to any restriction* other than a restriction which

---

**8.** The formula was changed in 1976. The rate was increased to 15 percent and was applied to the excess of the total of all tax preference items over the greater of $10,000 or one-half the taxpayer's income tax liability apart from the section 56 tax itself (subject to certain adjustments). 26 U.S.C. § 56(a) (1976).

**9.** In 1982, acquisition of stock by exercise of a section 422 qualified stock option was deleted from the section 57 list of items of tax preference subject to the minimum tax, and was replaced by acquisition of stock by exercise of a section 422A "incentive stock option." IRC § 57(a)(10) (1982); *see* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 201(b)(1)(B) & (C), 96 Stat. 324, 416–17 (1982) (amending IRC § 57(a)(6) & 57(a)(10)). The "incentive stock option" had been initially provided for by the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 251(a), 95 Stat. 172, 257–60 (1981) (enacting IRC § 422A).

**10.** Section 83(a) of the Code, 26 U.S.C. § 83(a) (1969), provides in pertinent part:

"§ 83. Property transferred in connection with performance of services

"(a) General rule.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

"(1) the *fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse )* at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

"(2) the amount (if any) paid for such property,

"shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable." (Emphasis added.)

by its own terms will never lapse) ...." [11] (Emphasis added.)

By the terms of its subsection (e), section 83 "shall not apply to—(1) a transaction to which section 421 applies." [12] Section 421, as below noted, provides, *inter alia*, for nonrecognition of income on transfer of stock pursuant to exercise of a qualified stock option meeting the requirements of section 422(a). It is conceded here that section 421 is applicable to the transfer of the Centex stock to McDonald.

*Employee Stock Options*

Even before there were particular statutory provisions expressly dealing with the taxation of employee stock options, it was recognized that the typical employee stock option, with its lack of transferability and other customary restrictions on exercise, had no ascertainable market value when granted, and that hence the *granting or receipt* of such an *option* was not a taxable event, and gave rise neither to income to the employee nor to a deduction to the employer. *See Commissioner v. Lo Bue*, 351 U.S. 243, 76 S.Ct. 800, 804, 100 L.Ed. 1142 (1956). However, when the option was *exercised*, the employee normally recognized ordinary income to the extent of the difference between the acquisition price and the then fair market value of the stock, with the employer being entitled to a deduction in the same amount. *Id.*

These rules were statutorily modified in 1950 by the enactment of what later became Code section 424, dealing with so-called employee "restricted stock options." Under this legislation, neither the grant nor the exercise of these "restricted stock options" resulted in taxable income to the employee (or a deduction to the employer), provided that the options met certain conditions.[13] The "restricted stock option" provisions were inapplicable to options issued after December 31, 1963 (except for options issued under certain pre-1964 plans or contracts). *See* 2 Bittker, *Federal Taxation of Income Estates and Gifts* § 60.5.4 at 60–44.

We are presently concerned with the "qualified stock option" which, pursuant to Code sections 421 and 422, enacted in 1964, largely replaced the "restricted stock option." [14] As Bittker, *supra*, explains:

"(1) a transaction to which section 421 applies,

"(2) a transfer to or from a trust described in section 401(a) or a transfer under an annuity plan which meets the requirements of section 404(a)(2),

"(3) the transfer of an option without a readily ascertainable fair market value, or

"(4) the transfer of property pursuant to the exercise of an option with a readily ascertainable fair market value at the date of grant."

**11.** As noted, the parties admit that there are no nonlapse restrictions involved here. Regulation section 1.83–3(h) provides:

"(h) Nonlapse restriction. For purposes of section 83 and the regulations thereunder, a restriction which by its terms will never lapse (also referred to as a 'nonlapse restriction') is a permanent limitation on the transferability of property—

"(1) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and

"(2) Which will continue to apply to and be enforced against the transferee or any subsequent holder (other than the transferor).

"... Limitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions. An obligation to resell or to offer to sell property transferred in connection with the performance of services to a specific person or persons at its fair market value at the time of such sale is not a nonlapse restriction...."

**12.** Section 83(e) provides:

"(e) Applicability of section.—This section shall not apply to—

**13.** These may be generally summarized as including: an option price at least 85 percent of the stock's market value when the option was granted, prohibition on option transfer except on death, option duration of not more than ten years, and applicability only to employees owning not more than ten percent of the employer's stock. These provisions were also conditioned on requirements respecting the employment relationship and restrictions on disposition of the stock within certain times after grant or exercise of the option. *See* 2 Bittker, *Federal Taxation of Income Estates and Gifts* § 60.5.4 at 60–44.

**14.** The "qualified stock option" was itself largely phased out by the Tax Reform Act of 1976 (Pub.L. No. 94–455, § 603, 90 Stat. 1520, 1574, amending §§ 422(b) & 422(c)) which made

"... Sections 421 and 422, enacted in 1964 to replace IRC § 424, provide tax benefits for 'qualified stock options,' whose main features are (1) an option price that is not below the fair market value of the stock when the option is granted, (2) a prohibition on transfer except at death, (3) stock ownership of not more than 5 percent (up to 10 percent for small corporations) ..., and (4) a duration of not more than five years.... By virtue of IRC §§ 421(a) and 422(a), no income is realized on the grant or exercise of a qualified stock option, and the employer gets no deduction under IRC § 162, relating to business expenses, with respect to the stock transferred to the optionee." *Id.* at 60–44 to 60–45.

Sections 421(a) and 422(a) also impose conditions respecting an employment relationship and require that the stock received on exercise of the option not be disposed of for three years thereafter.[15]

However, pursuant to the general principles summarized in *Lo Bue*, as modified in 1969 by the enactment of section 83, if the conditions of sections 421 and 422 are *not* met, then the employee exercising the unqualified option normally recognizes ordinary compensation income, and his employer a deduction, in the amount that the option price is exceeded by the stock's then "fair market value ... determined without regard to any restriction other than a restriction which by its terms will never lapse." § 83(a)(1).[16] On the other hand, if the conditions of sections 421 and 422 *are* met, no income to the employee (or deduction to the employer) is recognized respecting the exercise of the option; section 83(e)(1) provides that section 83 does not apply to the option exercise; and, if following the three-year period mandated by section 422(a), the stock is disposed of at a price greater than the option price, the resulting gain is taxed at the more favorable long-term capital gains rates.[17]

"qualified stock option" status inapplicable to options granted after May 20, 1976, except that options granted after that date and before May 21, 1981 might qualify if issued pursuant to a pre-May 21, 1976 plan (or in certain merger-type transactions as a substitute for an otherwise qualified option). 2 Bittker, *supra*, at 60–45; *see* Code § 422(b). The "incentive stock option" provided for in section 422A was established in 1981. *See* note 9, *supra*.

**15.** Section 421(a) provides, as here pertinent, that no income results to the optionee-employee (nor any deduction to the employer) on exercise of a stock option meeting the requirements of section 422(a). The latter provides that section 421(a) applies to the exercise of "a qualified stock option," the definition of which is given in section 422(b) (and includes the provisions summarized in the above quotation from Bittker, *supra* ), *only* if the stock is not disposed of within three years after receipt and if the exerciser has been an employee of the granting corporation (or certain related corporations) from the time the option was granted until not more than three months before its exercise. A disposition within the three-year period is a "disqualifying disposition," Code § 422(a)(1), rendering unavailable the nonrecognition provisions of section 421(a), except that transfers on death, and certain other transfers, are not disqualifying dispositions. *See* Code § 425(c).

**16.** The amount of income so recognized is added to the basis in the stock. *See* Reg. §§ 1.83–4(b), 1.421–6(e), 1.422–1(b)(2) Exs. 2 & 3. By

contrast, "[n]o adjustment shall be made to the basis of the stock received pursuant to the exercise of a qualified or restricted stock option as a result of the [section 56] minimum tax." Reg. § 1.57–1(f)(7).

**17.** In the event section 421(a) is inapplicable only because of a "disqualifying disposition" within the three-year period, then under section 421(b) the optionee recognizes *in the year of disposition* any income (and the employer any deduction) which is to be recognized on account of the option exercise. Section 422(c)(4) provides that in the event of such a disposition of stock acquired by exercise of a qualified stock option "the amount which is includible in the gross income of such individual, and the amount which is deductible from the income of his employer corporation, as compensation attributable to the exercise of such option shall not exceed the excess (if any) of the amount realized on such sale or exchange over the adjusted basis of such share." (However, since section 422(c)(4) applies only to sales or exchanges of the kind on which loss, if sustained, would be recognized, it is inapplicable to dispositions such as wash sales, gifts and certain transactions between related persons. *See* Reg. § 1.422–1(b)(2).) The amount of compensation income recognized on such a disqualifying disposition of stock acquired by exercise of a qualified stock option is the excess, if any, over the exercise price of the *lesser* of (a) the fair market value of the stock at exercise, determined with-

*Question Presented*

We thus must determine whether the Commissioner exceeded his authority in promulgating Reg. section 1.57–1(f)(3), by thereby incorporating into section 57(a)(6), which provides for a measurement based merely on "the fair market value" of the stock, the provision of section 83(a)(1) that such measurement is to be based on the stock's fair market value "determined without regard to any [lapse] restriction."

## THE STANDARD OF REVIEW

As with most agency interpretations of statute, Treasury regulations are generally reviewed with a great degree of deference. *See, e.g., Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). *See also Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). They are usually held valid if they " 'implement the congressional mandate in some reasonable manner.' " *Rowan Companies, Inc. v. United States,* 452 U.S. 247, 252, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981) (quoting *Correll,* 389 U.S. at 307, 88 S.Ct. at 450). Indeed, this Court has previously held that a regulation must be "presumed to be valid unless it can be demonstrated that the regulation is unreasonable and plainly inconsistent with the statute." *Zemurray Foundation v. United States,* 687 F.2d 97, 100 (5th Cir. 1982) (citing *Commissioner v. Portland Cement Company of Utah,* 450 U.S. 156, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981)).

■ However, we perceive an important difference between agency regulations that, on the one hand, are promulgated pursuant to an express delegation of authority to the agency to define specific terms, set specific standards or implement or enforce specific statutory provisions, and those which, on the other hand, are promulgated only under the agency's more general authority to, for example, "prescribe all needful rules and regulations"— the authority given the Secretary under IRC section 7805(a). The Commissioner admits that the authority to adopt the section 83 valuation rule in Reg. section 1.57–1(f)(3) is provided only by section 7805(a). Accordingly, we apply the rule stated in *United States v. Vogel Fertilizer Company,* 455 U.S. 16, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982):

> "The Commissioner has promulgated ... [a Treasury Regulation] interpreting this statute only under his general authority to 'prescribe all needful rules and regulations.' 26 U.S.C. § 7805(a). Accordingly, 'we owe the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision.' *Rowan Cos. v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981)."

We also observe that "[h]armony between statutory language and regulation is

---

out regard to restrictions, and (b) the consideration received for the disqualifying disposition. Reg. §§ 1.422–1(b)(2), 1.421–6(d)(2). Any gain on such a disqualifying disposition which exceeds the amount of compensation income required to be recognized (as above-provided) is, to the extent of such excess, treated as capital gain; whether it is long- or short-term capital gain depends on the holding period measured from the option exercise acquisition. If there is a loss (*i.e.,* sale below option exercise price) on a disqualifying disposition (within section 422(c)(4)), it is similarly treated as a capital loss; and no employee compensation income or employer deduction is recognized. *See* Reg. § 1.422–1(b)(2) Exs. 2, 3 & 4. (From 1954 through 1976, the holding period for long-term capital gain or loss was six months, as it is today. Code § 1222. During certain intervening periods it has been either nine months or one year.)

If a subsequent disposition which disqualifies the stock option exercise from the exemption provided by section 421(a) occurs in the same year as the option exercise, the exercise is not treated as an item of tax preference under section 57(a)(6). But if such a disposition occurs in a subsequent year, section 57(a)(6) nevertheless applies to the exercise, and the subsequent disposition (regardless of the amount of compensation income which is thereby recognized in respect to the exercise) is wholly disregarded for purposes of sections 57(a)(6) and 56. *See* Reg. § 1.57–1(f)(5)(i).

particularly significant in this case." *Rowan Companies*, 101 S.Ct. at 2292. Though Congress has not itself defined "fair market value," nevertheless, as discussed below, that term has long had a well-settled meaning both in federal tax law and otherwise. *See United States v. Cartwright*, 411 U.S. 546, 93 S.Ct. 1713, 1716–17, 36 L.Ed.2d 528 (1973). Established rules of statutory construction normally call for application of that meaning: where a term has a commonplace usage and is "used in the Code without limiting definition and without legislative history indicating a contrary result, its common and ordinary usage should at least be persuasive of its meaning as used in the Internal Revenue Code." *Commissioner v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965).

### FAIR MARKET VALUE

We express initially a strong disinclination to disturb the established meaning of the term "fair market value" as it was enunciated by the Supreme Court in *United States v. Cartwright:*

" 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' Treas.Reg. § 20.2031–1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves ...." 93 S.Ct. at 1716.

*See also id.* at 1718 & n. 8; *Palmer v. Commissioner*, 523 F.2d 1308, 1310 (8th Cir.1975); *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir.1975); *United States v. Parker*, 376 F.2d 402, 408 (5th Cir.1967); *Willow Terrace Development Co. v. Commissioner*, 345 F.2d 933, 936 (5th Cir.1965); *French Dry Cleaning*

*Co. v. Commissioner*, 72 F.2d 167 (5th Cir.1934); Reg. § 20.2031–1(b) (estate tax); § 25.2512–1 (gift tax); § 1.170–1(c)(1) (income tax deduction for charitable contributions); Reg. 63 Relating to Estate Tax Under the Revenue Act of 1921, Art. 13 (1922 Ed.) (cited in *Cartwright*, 93 S.Ct. at 1717 n. 7). *See generally* 10 Mertens, *The Law of Federal Income Taxation* § 59.01 at 3–4 & nn. 9, 10 (1984). *Cf. Andrews v. Commissioner*, 135 F.2d 314, 317–18 (2d Cir. 1943); Rev.Rul. 77–287, 1972–2 C.B. 319 (valuation of securities); Rev.Rul. 59–60, 1959–1 C.B. 237; Reg. § 20.2031–2(h) (securities subject to option or contract to sell will be valued for estate tax purposes according to value embodied in contract or option unless such is merely device to pass them for less than full and fair consideration). This definition of fair market value has been relied upon for many years in various taxation and commercial contexts, and we are reluctant to impute a different meaning to the term where it has been used without modification, absent a compelling and certain impetus.

We note particularly that it has long been recognized that restrictions of the very kind here in issue affect the fair market value of the stock subject thereto. As the Tax Court said in *LeVant v. Commissioner*, 45 T.C. 185, 204 (1965), *rev'd on other grounds*, 376 F.2d 434, 441–42 (7th Cir.1967), "It has been held in several cases that the restriction on the sale of investment letter stock reduces the value of the stock below the fair market value of the stock without the restriction ...." *See also Victorson v. Commissioner*, 21 T.C.M. 1238, 1246 (CCH) (1962), *aff'd*, 326 F.2d 264 (2d Cir.1964)[18]; *Goldwasser v. Commissioner*, 47 B.T.A. 445, 457 (1942), *aff'd mem. per curiam*, 142 F.2d 556 (2d Cir.), *cert. denied*, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 612 (1944)[19]; *Bolles v. Com-*

---

**18.** In *Victorson*, the Tax Court stated, "[S]uch restrictions did have the effect of depressing the fair market value of the option stock as compared to the fair market value of unrestricted, registered ... stock."

**19.** In *Goldwasser*, the Tax Court said, "Considering the fact that the shares could have been disposed of in the manner suggested by the respondent, including a private sale, we have concluded that their actual fair market value was somewhat less than the price at which they

*missioner*, 69 T.C. 342, 354 (1977) ("The value of stock which may be sold only to persons who take for investment is significantly decreased by such restriction."); *Husted v. Commissioner*, 47 T.C. 664, 678–79 (1967); *Specialty Paper and Board Co., Inc. v. Commissioner*, 24 T.C.M. 1085, 1088–89 (CCH) (1965); *Conroy v. Commissioner*, 17 T.C.M. 21, 25 (CCH) (1958); *Simmons v. Commissioner*, T.C.M. 1423 (CCH) (1964).

When Congress enacted section 57(a)(6), we can thus safely presume that it was aware not only of the long-accepted meaning of the term "fair market value," but also of the fact that the presence of restrictions on stock such as the restrictions involved here tended to reduce that stock's "fair market value" from what it would have been absent the restrictions. Indeed, it is evident that Congress *was* so aware: Code sections 57 and 83 were both enacted at the same time, each being part of the Tax Reform Act of 1969. *See* Pub.L. No. 91–172, §§ 301(a), 321(a), 83 Stat. 581, 588 (1969). In section 83, Congress specifically provided that the measurement of taxable income was to be made on the basis of the "fair market value" of the stock "determined without regard to any [lapse] restriction." Employment of the latter phrase necessarily bespeaks recognition that the former, standing alone, includes at least some consideration of some such restrictions.

Of course, we fully appreciate that the settled meaning of "fair market value" does not provide the equivalent of a precise scientific formula, and that, in any event, practical considerations may well dictate that some factors, though theoretically of potential relevance to a determination of fair market value as so understood, nevertheless should be disregarded, or assigned an arbitrary weight, when fair market value is employed as a measuring device in the workaday world of business or taxation. The cost or difficulty of attempting to calibrate in each instance the precise effect of a particular factor on fair market

value may outweigh the utility of any resulting likely increase in the accuracy of the ultimate determination. It may also be conceded that the need for accuracy in measurement may vary with the use to be made of the resulting fair market value figure. Certainly, there is room for regulatory discretion for such purposes under section 7805(a). But even for these purposes, that discretion is not unlimited. *See United States v. Cartwright*, 93 S.Ct. at 1719–20. And this establishes that, considerations of administrative convenience and practicality aside, the standard of fair market value has a significance and meaning that is independent of the ultimate purpose for which fair market value is ascertained in any particular case.

The IRS does not contend that Reg. section 1.57–1(f)(3) is justified by considerations of practicality or administrative convenience, or that it sets out a generally appropriate manner for determining the fair market value of stock subject to restrictions of the kind here involved. Indeed, the concepts in this regulation are employed by the IRS to ascertain the fair market value of such stock for almost no purposes other than those of section 83— where the statute expressly directs that all lapsing restrictions be disregarded—and of section 57(a)(6), where there is no such direction. It is thus plain that Reg. section 1.57–1(f)(3) does not involve a *definition* of fair market value. Rather, it is a determination that something *other than* simply the "fair market value" of stock acquired by exercise of a qualified stock option should be used to determine whether and to what extent an item of tax preference thereby arises for purposes of the minimum tax. Indeed, this is the Commissioner's very argument in support of the challenged regulation: namely, that the settled standard of fair market value is an *inappropriate* measure of the value taxable under sections 56 and 57(a)(6), and that the only appropriate measure of such value is that prescribed by section 83, the concededly different standard of "fair market value

could have been sold on the open market on the

date actually received." 47 B.T.A. at 457.

... determined without regard to any [lapse] restriction." In sum, the Commissioner's argument is not that the McDonalds have mismeasured their stock's fair market value, but is rather that, for purposes of section 57(a)(6), "fair market value" alone is not the relevant benchmark for measurement as against the option price. If the Commissioner is correct in this contention—or if the Secretary has the authority to so provide by regulation under section 7805(a)—then Reg. section 1.57–1(f)(3) must be sustained. But if the law be otherwise, then we cannot uphold this regulation simply on the theory that it provides a reasonable means of ascertaining "fair market value."

## THE APPROPRIATE SECTION 57(a)(6) BENCHMARK

The Commissioner urges that, in the Tax Reform Act of 1969, Congress intended both to expand the amount of income taxed as ordinary compensation income on exercise of nonqualified employee stock options, by section 83, and also, by sections 56, 57 and 58, to impose a minimum tax on items of tax preference, including therein the "bargain element" existing on exercise of most qualified stock options. He asserts that therefore the purposes of sections 56, 57 and 58 cannot be fully achieved in this respect unless the section 83 standard of measuring compensation is imported into section 57(a)(6). This argument is not without considerable force at a theoretical level. However, our examination of the wording and legislative history of sections 56, 57 and 58, on the one hand, and section 83, on the other, indicates no precise interrelationship of this kind between them, and reveals no specific indication of congressional intent to apply the section 83 compensation measure to section 57(a)(6).

### Legislative History, Section 83

Prior to 1959, if the stock was subject to restrictions when an option—other than a "restricted stock option" under section 424 —was exercised, and if the restrictions did

not prevent ascertainment of the stock's then fair market value, income was then realized respecting the option exercise in an amount equal to the spread between the exercise price and the then fair market value of the stock as burdened by the restrictions. *See Hirsch v. Commissioner,* 51 T.C. 121, 136–37 (1968). *See also Commissioner v. Lo Bue,* 76 S.Ct. at 804. Thereafter, and prior to the enactment of section 83, with respect to an option that was neither a "restricted stock option" under section 424 nor a "qualified stock option" under section 422, if, when the option was exercised, the stock was subject to a restriction having "a significant effect on its value," income was not recognized until the restriction lapsed or the stock was sold or exchanged in an arm's length transaction, whichever occurred first, and the amount then so recognized was the *lesser* of (a) the spread between the option exercise price and the stock's fair market value at exercise determined without regard to restrictions, and (b) the spread between the option exercise price and (i) the consideration received on such a sale or exchange prior to lapse of the restrictions or, otherwise, (ii) the stock's fair market value when the restrictions lapsed. Reg. § 1.421–6(d)(2)(i). *See* T.D. 6416, 1959–2 C.B. 126.[20] The stock's basis was generally adjusted by the amount of income so recognized. Reg. § 1.421–6(e)(1).

The Tax Reform Act of 1969, by its enactment of Code section 83, changed these rules principally by requiring that any income be recognized on exercise of the nonqualified option, and that lapse restrictions on such stock were to be disregarded in determining the amount of income to be thus recognized. This legislation specifically provided that it would not apply to exercise of qualified stock options. Code § 83(e). No amendment was made to the existing provision of Code section 422(c)(4) that, in the case of a disqualifying sale of stock which had been acquired by exercise of a qualified stock option, income recog-

---

**20.** This assumes that the option had no ascertainable fair market value when granted; also, that no consideration was paid for the grant of the option.

nized would not exceed the spread between the exercise price and the consideration received on the sale (the latter presumably reflecting fair market value as affected by any then extant restrictions, lapse or nonlapse).

The House Report on section 321 of the House bill (H.R. 13270, 91st Cong., 1st Sess., 1969)—which became section 83 of the Code—explains the considerations prompting its enactment as follows:

"Present law does not contain any specific rules governing the tax treatment of deferred compensation arrangements known as restricted stock plans.

"A restricted stock plan, generally, is an arrangement under which an employer transfers stock to one or more of his employees (often without the payment of any consideration), where the stock is subject to certain restrictions which affect its value. . . .

"The restrictions which are imposed on the stock are of various types. One type of restriction often imposed requires the employee to return the stock to the employer if he does not complete a specified additional period of employment and prohibits the employee from selling the stock in the interim. Another common type of restriction provides that the employee may not sell the stock for a specified period of time, such as a 5-year period, or until he retires.

"The existing Treasury regulations generally provide that no tax is imposed when the employee receives the restricted stock. Tax is deferred until the time the restrictions lapse; at that time, only the value of the stock when it was transferred to the employee (determined without regard to restrictions) is treated as compensation, provided the stock has increased in value. If the stock has decreased in value in the interim, then the lower value at the time the restrictions lapse is considered the amount of compensation. Thus, under existing regulations there is a deferral of tax with respect to this type of compensation, and any increase in the value in the stock between the time it is granted and the time when the restrictions lapse is not treated as compensation.

". . . The present treatment of restricted stock plans is significantly more generous than the treatment specifically provided in the law for similar types of deferred compensation arrangements. . . .

". . . .

"It has been suggested by some that restricted stock plans are not, in fact, deferred compensation arrangements, but rather are a means of allowing key employees to become shareholders in the business. Your committee believes, however, that this line of reasoning overlooks the fact that in 1964 Congress specifically dealt with the matter of the appropriate means by which key employees could be provided with a stake in the business when it revised the treatment of qualified employee stock options.

"A series of specific requirements were provided by Congress which must be satisfied in order to obtain favorable tax treatment in the case of stock options. A number of these requirements were designed to decrease the compensatory nature of stock options and to place more emphasis on stock options as a means of giving employees a stake in the operation of their business. Your committee does not believe it was intended that substantially similar tax benefits should be available under a slightly different type of arrangement, such as a restricted stock plan, where none of the conditions which it specified for qualified stock options must be satisfied. For example, a stock option qualifies only if it is issued at 100 percent of the market price of the stock at the time of issuance. Thus, to acquire stock pursuant to the option, the employee would have to pay the full market price of the stock as of the option issuance date. Restricted stock, on the other hand, may be given to an employee for no consideration at all. Thus, the employee has to pay nothing to obtain the stock.

"To the extent that a restricted stock plan can be considered a means of giving employees a stake in the business, your committee believes the present tax treatment of these plans is inconsistent with the specific rules provided by Congress in the case of qualified stock options, which were considered by Congress as the appropriate means by which an employee could be given a shareholder's interest in the business." H.R.Rep. No. 91–413, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 1645, 1733–35 (hereafter cited as H.R. Rep., with page references to this reprinting).

The Senate adopted section 321 of the bill with a few changes, none material here. The Senate Report explanation of the background and purpose of section 321 of the bill contains language almost identical to that above-quoted from the House Report. *See* S.Rep. No. 91–552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2150–52 (hereafter cited as S.Rep. with page references to this reprinting). The Senate Report also states, "The rules provided by the bill with respect to restricted property are not to apply to: (1) a transaction which involves a stock option (to which sec. 421 applies)." S.Rep. at 2153. The House Report reflects the same intention.[21]

Nothing in the legislative history of section 83 contains any reference to the minimum tax or to the portions of the bill which became sections 56, 57 or 58 of the Code. *See* H.R.Rep. at 1733–37; S.Rep. at 2150–56; Conf.Rep. at 2418. Moreover, this legislative history indicates no dissatisfaction with the operation of the qualified stock option provisions of the Code, nor any purpose or intent to discourage their use or to minimize the tax or economic advantages attendant thereto. Rather, it seems to reflect a congressional perception that the taxation of the exercise of *non*qualified stock options should be "tightened up"— precisely because such options *were non*-qualified and did not meet the requirements that Congress had imposed on qualified options.

*Legislative History, The Minimum Tax*

Of course, prior to the Tax Reform Act of 1969, there was no minimum tax on items of tax preference.

What became sections 56, 57 and 58 of the Code originated as section 301 of the House bill, which proposed a *limit* on tax preferences under which "an individual is to be allowed to claim the exclusions and deductions comprising tax preference income only to the extent that the aggregate amount of these preferences does not exceed one-half of his total income." H.R. Rep. at 1725. The House Committee explained the concerns leading to this proposal as follows:

"Under present law, there is no limit on how large a part of his income an individual may exclude from tax as a result of the receipt of various kinds of tax exempt income. Individuals whose income is secured mainly from tax-exempt State and local bond interest, for example, may exclude practically all their income from tax. *Similarly*, individuals may pay tax on only a fraction of their *economic income*, if such income is derived primarily from long-term capital gains (only one-half of which are included in income) or if they enjoy the benefits of accelerated depreciation on real estate. Individuals may also escape tax on a large part of their *economic income* if they can take advantage of the present special farm accounting rules or can deduct charitable contributions which include appreciation in value which has not been subject to tax.

---

**21.** The House Report states, "The rules provided by the bill with respect to restricted property do not apply to (1) a transaction to which section 421 of the code (relating to stock options) applies ...." H.R.Rep. at 1736.

Nothing here material is contained in the Conference Report, the conference substitute adopting the Senate amendments. *See* Conference Report No. 91–782, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 2392, 2418 (Statement of the Managers on the Part of the House) (hereafter cited as Conference Report or Conf.Rep., with page references to this reprinting).

"... The present treatment which imposes no limit on the portion of his income that an individual may exclude from tax results in an unfair distribution of the tax burden....

"....

"... Your committee's bill contains a number of provisions which are designed to reduce drastically the ability of individuals to escape payment of tax on *economic income*....

"In addition, for the reasons discussed above, your committee's bill provides a 'limit on tax preferences' to assure that those individuals who are financially able to pay tax will include in taxable income at least one-half of their *economic income*...." H.R.Rep. at 1724–25 (emphasis added).

However, the House bill did *not* include as a tax preference item any amount in respect to the exercise of qualified or restricted stock options. H.R.Rep. at 1726.[22]

In the Senate, the House approach was changed, so that, in place of a *limit* on tax preferences, there was instead imposed a special *flat* tax on items of tax preference that exceeded a certain amount. S.Rep. at 2142–49; *see* Conf.Rep. at 2416. Nonetheless, this approach was motivated by the very same concerns which had prompted the House to propose section 301(a) of its bill. The Senate Report states:

"Under present law, many individuals and corporations do not pay tax on a substantial part of their *economic income* as a result of the receipt of various kinds of tax-exempt income or special deductions....

"Both individuals and corporations, for example, now pay the equivalent of the regular income tax on only part of their long-term capital gains. Individuals with large interest payments on funds borrowed to carry growth stock may use the interest deduction to reduce other unrelated taxable income. They may offset

practically all their income in this manner and, as a result, pay little or no tax. Similarly, individuals and corporations may escape tax on a large part of their *economic income* if they receive accelerated depreciation on real property and intangible drilling and development expenses and percentage depletion in excess of cost depletion. Financial institutions also pay lower taxes than other corporations to the extent that their deductions for bad debt reserves exceed the deductions that would be allowed on the basis of actual loss experience.

"... The present treatment which permits individuals and corporations to escape tax on certain portions of their *economic income* results in an unfair distribution of the tax burden. This treatment results in large variations in the tax burdens placed on taxpayers who receive different kinds of income. *In general, high-income individuals, who get the bulk of their income from personal services, are taxed at high rates.* On the other hand, those who get the bulk of their income from such sources as capital gains or who can benefit from accelerated depreciation on real estate pay relatively low rates of tax....

"....

"The committee has adopted many provisions that are specifically designed to reduce the scope of existing tax preferences. However, the committee believes that an overall minimum tax on tax preferences is also needed to reduce the advantages derived from these preferences and to make sure that those receiving such preferences also pay a share of the tax burden. As indicated below, the committee has amended the House bill to substitute an overall minimum tax for the limit on tax preferences and the allocation of deductions provisions in the House bill....

"The committee believes that this minimum tax will be a more effective and

---

**22.** The House also addressed the tax preference concern by requiring, in section 302 of the bill, that a portion of deductions be allocated to tax preference items, and hence effectively reduced.

Again, however, the tax preference items did *not* include any amount in respect to the exercise of qualified or restricted stock options. H.R.Rep. at 1727–30.

considerably simpler method of imposing tax on preference items than the House provisions...." S.Rep. at 2142–43 (emphasis added).

The Senate deleted three items which section 301(a) of the House bill had treated as tax preferences. S.Rep. at 2147.[23] It also added several items that were not included in section 301 of the House bill, including the provision which became section 57(a)(6) relating to qualified stock option exercises. *See* S.Rep. at 2145 & n. 1. The only reference to this provision in the Senate Report is the following:

"The items of tax preference included in the base of the 5 percent tax under the committee amendment are as follows:

"....

"(7) Bargain element in stock options. —In the case of qualified stock options (or restricted stock options), this is the excess of the fair market value of the stock at the time of the exercise of the option over the option price of the stock." *Id.* at 2144–45 (footnote omitted).[24]

The Conference Report follows the Senate version of the bill, with certain minor exceptions. Conf.Rep. at 2416–17. The only reference to stock options is the following:

"The items of tax preference included in the base of the 10-percent tax under the Senate amendment are as follows:

"....

"(7) in the case of qualified stock options, the excess of the fair market value of the stock at the time of the exercise of the option over the option price of the stock; ...." *Id.* at 2416.

None of the legislative history contains any reference to the effect of restrictions on the value of stock, or to section 321 of the bill (which became Code section 83) or to the principles embodied therein. The only references to the measuring base for this item of tax preference are to the "fair market value" of the stock at the time of exercise. There is nothing specific in the legislative history which states, expressly or by inference, that the "fair market value" measuring base was to be modified, as it was expressly in the provisions which became Code section 83.

The minimum tax was, of course, intended as a vehicle by which to impose a special flat rate tax on some "economic income" that had theretofore escaped taxation under the existing taxing provisions of the Code by virtue of especially favorable tax treatment accorded by various other Code sections. However, it is by no means self-evident that the spread between the exercise price and the fair market value of the stock as if it were unrestricted represents "economic income." The stock may be sold at arm's length before the restrictions lapse with the result that the amount received will be less than the unrestricted price, or the general market price may have decreased by the time the lapse of the restrictions first makes it possible to obtain an unrestricted price. The taxable income which, when enactment of the minimum tax was being considered, had theretofore been "avoided" by the preferential tax treatment resulting from qualification of the option did not exceed real economic income, as the income arising from exercise of a nonqualified stock option was then limited to the spread between the exercise price and either the fair market value of the stock when the restrictions lapsed or the amount received on an earlier arm's length sale. While, for ordinary income tax purposes, this limitation was eliminated as to *non*qualified option stock by section

---

23. These were: interest on state and municipal bonds, deleted generally out of concern for the revenue needs of these governments; appreciation on the value of property deducted as a charitable contribution; and losses from special farm accounting rules. Each of the latter were deleted principally because other sections of the Senate bill reduced the tax advantages in these areas.

24. The Senate Report footnotes this item, and all others added by the Senate, with the notation that it is an item "not covered by the House provisions for a Limit on Tax Preferences and Allocation of Deductions." S.Rep. at 2145 & n. 1.

83, which encompasses the possibility of taxing some merely theoretical rather than real economic income, there is no indication in the legislative history that the amount on which section 83 would have *newly* imposed ordinary tax where an unqualified option was exercised was what was intended to be captured for minimum tax purposes where the option was qualified. Moreover, the enactment of section 83 does *not* modify the provisions of section 422(c)(4), under which income recognized (for purposes of the regular income tax) as a result of a disqualifying disposition of stock acquired by exercise of a *qualified* stock option did (and does) *not* exceed the spread between the option exercise price and the amount received on the disqualifying sale, which latter amount presumably reflects the effect of any then extant restrictions, lapse as well as nonlapse. This is at least some indication that Congress did not necessarily consider the section 83 standards as an appropriate measure of

"untaxed" income in the case of the exercise of a *qualified* stock option.

Further, as the concurring Tax Court opinion in *Gresham* observes:

"This additional tax, the minimum tax, is, in effect, a 'flat tax' imposed on specified tax preference items without the ameliorating effects of most deductions, bases adjustments, or carryover and carryback deductions prescribed for the income tax. All the tax preference items except the one here involved are deductions (accelerated depreciation, amortization of various assets, etc.) for which the full tax benefit has been received; the section 57(a)(6) stock option item, in contrast, is an income item, and Congress had to make a policy decision as to what valuation methods should be used to measure the 'economic income' (S.Rept. 91–552 (1969), 1969–3 C.B. 423, 495), derived from stock options qualified under section 421." 79 T.C. at 333.[25]

**25.** The Commissioner cites the General Explanation of the Tax Reform Act of 1969 by the Joint Committee, 91st Cong., 1st Sess., at 104–07, (*reprinted in* H. Olsen, 269–2d Tax Magmt (BNA), Minimum Tax-Items of Tax Preference, at B–701–03 (1977)), particularly the following:

"General reason for change.—The prior treatment imposed no limit on the amount of income which an individual or corporation could exclude from tax as the result of various tax preferences. As a result, there were large variations in the tax burdens placed on individuals or corporations with similar economic incomes, depending upon the size of their preference income. In general, those individual or corporate taxpayers who received the bulk of their income from personal services or manufacturing were taxed at relatively higher tax rates than others. On the other hand, individuals or corporations which received the bulk of their income from such sources as capital gains or were in a position to benefit from net lease arrangements, from accelerated depreciation on real estate, from percentage depletion, or from other tax-preferred activities tended to pay relatively low rates of tax. . . .

"Explanation of provision.—The Act provides a minimum tax on specified tax preference income received by individuals and corporations in order to make sure that all taxpayers are required to pay significant amounts of tax on their economic income. The minimum tax amounts to 10 percent of

the sum of an individual's or corporation's (or estate's or trust's) tax preference income (i.e., *income which would be taxed but which is not because of a tax preference* ) to the extent it exceeds $30,000 plus the regular income tax . . . ." Joint Comm. at 105; Olsen at B–701 (emphasis added).

Particular stress is placed on the italicized words (the italicization being the Commissioner's, not the Joint Committee's).

We do not regard the Commissioner's contentions in this respect as determinative. The Joint Committee is a staff committee, and its "Explanation" was issued after the fact. Hence it does not directly represent the views of the legislators or an explanation available to them when acting on the bill. The Joint Committee's views, however, are entitled to great respect.

We note in this connection that, at the place in the Joint Committee's "Explanation" where the italicized words appear, no reference has previously been (or is then being) made to the exercise of qualified stock options, though other items of tax preference have been specifically mentioned (and reference has been made to "economic income"). As observed in the text, the concurring Tax Court opinion in *Gresham* calls attention to the rather unique nature of this particular item of tax preference. When the Joint Committee's "Explanation" comes to discuss specifically the various particular items of tax preference, it describes the one here at issue simply as:

"(g) Tax benefits from stock options.—In the case of qualified stock options or restrict-

Further, the Commissioner's approach does not produce a scheme under which the minimum tax invariably operates on otherwise *un*taxed economic income arising from the exercise of qualified stock options. If such stock is sold in a year subsequent to the year of option exercise but before expiration of the three-year holding period of section 422(a), *income is* recognized (and taxed as compensation) in respect to the exercise, even though the "bargain" element of the option exercise has been included (and subjected to the minimum tax) as an item of tax preference.

### Conclusion as to Legislative History

The plain wording of sections 57(a)(6) and 83 reflects that a *different* measurement base was intended in each section—"fair market value" in section 57(a)(6), and "fair market value ... determined without regard to any [lapse] restriction" in section 83(a)(1). Nothing in the legislative history of either section points to a contrary conclusion. The legislative history does not in this instance, therefore, justify departure from what appears to be the plain import of the statutory language.

### Subsequent Developments

The Commissioner points out that Reg. section 1.57–1(f)(3) was initially proposed on December 30, 1970, *see* 35 Fed.Reg. 19757 (1970), and was formally adopted on September 12, 1978, *see* 43 Fed.Reg. 40459 (1978), and that during this time, as well as thereafter, Congress amended other portions of section 57 on several occasions: in 1971, 1976, 1977, and 1978, the latter amendments having finally passed the Senate and House on October 15, 1978.[26] Because none of these amendments to section 57 dealt with subsection 57(a)(6), the Com-

ed stock options, this is the excess of the fair market value of the stock at the time of exercise of the option over the option price of the stock." Joint Comm. at 106; Olsen at B–702. Nothing in the Joint Committee's "Explanation" of the minimum tax mentions restrictions on the stock or their effect; nothing there refers to section 83 (or its principles).

Accordingly, we decline to treat the Joint Committee's passing reference to "income which would be taxed but is not because of a tax preference," contained as it is only within a

missioner invites us to infer that Congress, which, he asserts, must have been aware of the regulation as proposed and adopted, therefore acquiesced in the Treasury Department construction. However, as the Tax Court observed in *Gresham:*

> "There is, however, no evidence that Congress ever focused on this particular regulation, which is not unusual since it remained in proposed form during that 8-year period. Until 1978, ... [the Commissioner's] interpretation was uncertain.[12]

> "[12] The preamble to T.D. 7564, 1978–2 C.B. 19, reflects that consideration was given [by the Treasury] to comments received on this part of the proposed regulation urging that restrictions should be taken into account." 79 T.C. at 330.

Nor do we consider the period following the promulgation of Reg. section 1.57–1(f)(3) in September 1978 as sufficiently long to warrant a presumption of congressional approval merely on the basis of inaction, there being no specific indication that Congress during this time was aware of the regulation or that it had section 57(a)(6) under consideration. As the Tenth Circuit observed in *Gresham*, when rejecting an argument identical to that which the Commissioner makes here: "Indeed, the Commissioner concedes 'that Congress may not have been focusing in on the provisions of Section 57(a)(6) at that time, ....' " 752 F.2d 518, 522 (10th Cir.1985). This same language from the Commissioner's brief quoted by the *Gresham* court likewise appears in the Commissioner's brief here.

We also observe that at the time of the 1978 legislation, there was pending in the Tax Court a challenge to the validity of the regulation. *See Kolom v. Commissioner,*

general discussion of the minimum tax, and being parenthetical in nature, as purporting to describe a formula intended to be applied to determine the meaning of section 57(a)(6).

**26.** The 1978 legislation was the Revenue Act of 1978, Pub.L. No. 95–600, §§ 301(b)(2), 402(b)(1), 421(b), 701(b)(1), (3), (4), (f)(3)(D), 92 Stat. 2763, 2820, 2868, 2874, 2898, 2899, 2901, 2946 (1978), and the Energy Tax Act of 1978, Pub.L. No. 95–618, § 402(b), 92 Stat. 3174, 3202, 3205 (1978).

71 T.C. 235 (1978), *aff'd,* 644 F.2d 1282 (9th Cir.), *cert. denied,* 454 U.S. 1011, 102 S.Ct. 548, 70 L.Ed.2d 412 (1981). The Tax Court in *Kolom* ultimately declined to determine the regulation's validity where it worked a change from established concepts of fair market value. We recognize that a contrary view was expressed by the district court in *Harrison v. United States,* 475 F.Supp. 408, 414 (E.D.Penn.1979), *aff'd without published opinion,* 620 F.2d 288 (3d Cir.1980). We respectfully disagree with this aspect of *Harrison.* As the Third Circuit said in *Commissioner v. Sun Pipe Line Co.,* 126 F.2d 888, 892 (3d Cir.1942):

> "We do not believe that four years is a sufficiently long continued usage where the first two cases to raise the point before the Board of Tax Appeals are those we are now hearing on appeal. In such circumstances the silent acquiescence of Congress may not be presumed, since legislative knowledge of the regulations appears too doubtful." (Footnote omitted.)

The Commissioner attaches additional significance to the decisions in *Kolom* and *Harrison* and the legislation following them. In *Kolom,* the Tax Court held that the provisions of section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b), which render a corporate "insider" liable to the corporation for any profit realized from a sale of its stock within six months after acquisition, did not affect the section 57(a)(6) fair market value of stock acquired by the insider's exercise of a qualified stock option "since section 16(b) does not affect the value of the stock in the eyes of the purchaser." 71 T.C. at 249.[27] The Tax Court expressly declined to pass on the validity of Reg. section 1.57–1(f)(3) since,

*apart* from that regulation, "the law is that the fair market value of stock received by a taxpayer subject to section 16(b), Securities Exchange Act, is its selling price on the New York Stock Exchange when it is received." 71 T.C. at 242–43. *Harrison* was a similar case, and the court there reached a similar result. However, *Harrison* expressly held Reg. section 1.57–1(f)(3) to be valid. 475 F.Supp. at 414–15. Nevertheless, as an alternate ground for decision, *Harrison* also held that "[e]ven assuming the invalidity of the regulation," section 16(b) does not affect fair market value because it "does not prevent the insider from selling the stock, nor does it affect the stock in the hands of the purchaser." *Id.* at 415.

Both the Tax Court and the Tenth Circuit observed in *Gresham* that the lettered stock restrictions here in issue operate differently than the provisions of section 16(b). The investment letter restrictions are applicable to the *stock* itself, and indeed are reflected on the certificates; they bind not only the transferor but also any transferee. Moreover, they legally prohibit and practically prevent the *stock* from being sold except in a private placement.[28] Therefore, whatever the merits of the result reached in *Kolom* and *Harrison,* we do not consider those decisions controlling here.

The Commissioner also contends that Congress responded to the decisions in *Kolom* and *Harrison* by enacting section 252 of the Economic Recovery Tax Act of 1981, which added Code section 83(c)(3), providing that, with respect to taxable years ending after December 31, 1981, where sale of

---

**27.** The Tax Court in *Kolom* also pointed out that, under the SEC regulation 16(b)–6, 17 C.F.R. § 240.16b–6 (1977), if the option is exercised more than six months after it is granted, the maximum section 16(b) liability is the *lesser* of (*1*) the excess, if any, of the sales price over the exercise price, *and* (*2*) the excess, if any, of the sales price over the lowest quoted market price within the period from six months before to six months after the exercise of the option. Thus, at the time the option is exercised (assuming the option was granted more than six

months previously) it may be impossible to know whether a sale then or shortly thereafter will impose liability on the insider, since it cannot then be known whether or how much the market will fall in the six months following exercise. *See* 71 T.C. at 237 n. 3, 244 n. 9, 249 n. 14.

**28.** The parties have stipulated that McDonald could not legally force Centex to register his stock.

the property at a profit would subject the seller to liability under section 16(b) of the Securities and Exchange Act, the person's right in the property would be considered both to be subject to a substantial risk of forfeiture and not to be transferable. Pub.L. No. 97–34, § 252(a), 95 Stat. 260 (1981) (approved August 13, 1981, *see* 95 Stat. 172). This had the effect of postponing the stock valuation date, and the recognition of income under section 83(a), until the expiration of the section 16(b) six-month period following acquisition (option exercise). The Commissioner claims that it is "significant ... that Congress did not similarly act to modify the operation of the minimum tax provisions of Section 57(a) with respect to qualified option stock that is subject to restrictions, either under Section 16(b) or otherwise." If significance is to be attached to that omission, however, it might just as arguably be that Congress did not conceive that the proper role of section 57(a)(6) was to automatically define as preference income the very same amount that would have been recognized under section 83 if the option were not a qualified one.[29] The more likely explanation for the asserted congressional "omission" is simply that Congress was not then concerned with qualified stock options. The Tax Reform Act of 1976 had already sounded the death knell for qualified stock options, decreeing that after May 20, 1976 plans could not be adopted, and that options could not be granted even under earlier plans after May 20, 1981 (over two months before the enactment of the Economic Recovery Tax Act of 1981). *See* note 14, *supra*. Moreover, in section 251 of the Economic Recovery Tax Act of 1981, Congress also added section 422A to the Code, providing for favorable tax treatment of the "incentive stock option," which is somewhat a successor to the "qualified stock option." Pub.L. No. 97–34, § 251, 95 Stat. 172, 256–60 (1981). However, Congress did *not* at that time make the exercise of an "incentive stock option" an item of tax preference. Accordingly, there was little or no occasion for Congress to then concern itself with the application of section 57(a) to the exercise of stock options. The Commissioner characterizes the failure of Congress to bring the exercise of "incentive stock options" under section 57(a) in 1981 as merely "an apparent oversight." If this be the case as to incentive stock options, we see no reason not to similarly characterize the other "omissions" of Congress to which the Commissioner would have us attach a positive significance favorable to his case.

The Commissioner, however, also points to the fact that Congress amended IRC section 57(a)(10) in 1982 and made the exercise of an "incentive stock option" an item of tax preference. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 201(b)(1)(C), 96 Stat. 324, 417 (1982) ("TEFRA").[30] In new Code section 57(a)(10), the exercise of an incentive stock

---

**29.** The Commissioner also finds it significant that Congress did not respond to this Court's decision in *Pledger v. Commissioner,* 641 F.2d 287 (5th Cir.), *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (November 2, 1981), which held that section 83(a) was constitutional and applicable to restrictions similar to those here. *Pledger,* however, involved neither a qualified stock option nor the minimum tax, and no question of the application of section 83(a) to section 57(a)(6) was presented. Our decision here in no way questions *Pledger* or the validity of section 83(a). We also observe that the potential harshness of section 83(a) as applied to similarly restricted stock is mitigated by the basis adjustment given in correspondence to the amount of income recognized, and the consequent tax loss benefits if the stock is sold at a price lower than the amount used to calculate section 83 income. This factor was considered to be of some significance by the Second Circuit in *Sakol v. Commissioner,* 574 F.2d 694, 700 & n. 20 (2d Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978), on which we relied in *Pledger.* 641 F.2d at 290, 291 & n. 11. No such basis adjustment is available with respect to the minimum tax. *See* note 16, *supra.* Finally, certiorari was not denied in *Pledger* until *after* enactment of the Economic Recovery Tax Act of 1981.

**30.** Section 201(b)(1)(B) of the TEFRA likewise amended IRC section 57(a)(6) so as to delete exercise of a qualified stock option as an item of tax preference. Section 201(e) provides that these amendments all apply to taxable years beginning after December 31, 1982.

option is defined as an item of tax preference in

> "the amount by which the fair market value of the share at the time of exercise exceeds the option price."

The Commissioner contends that this constitutes an implied approval of Reg. section 1.57–1(f)(3), as otherwise Congress would have expressly negated application of the principles of that regulation.

We do not consider the matter so clearcut. When Congress passed the TEFRA, the validity of this regulation was under challenge. A few years previously in *Kolom* the Tax Court had expressly reserved decision on the question. Justice Powell's dissent from the denial of certiorari in *Kolom* also cast doubt on the regulation's validity. And although the district court in *Harrison* had expressly sustained the regulation, it had also articulated an alternate ground for its decision; because the Third Circuit's *Harrison* affirmance was without written opinion, it is—and was—necessarily unclear on which ground that action rested. Further, the regulation was under consideration by the Tax Court in *Gresham,* and, a few days prior to passage of the 1982 legislation, the Tax Court struck the regulation down. Finally, it is plausible to infer that, if Congress had focused on the matter at all in 1982, it would have then expressly put it to rest.

We are confirmed in this latter view by Congress' 1984 action amending section 57(a)(10)—listing exercise of an incentive stock option an item of tax preference—by adding to it the sentence, "For purposes of this paragraph, the fair market value of a share of stock shall be determined without regard to any restriction other than a restriction which, by its terms, will never lapse." *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 555(a)(2), 98 Stat. 494, 897–98 (1984). Most significantly, however, the 1984 legislation expressly provides that this amendment to section 57(a)(10) applies *only* to options granted *after* March 20, 1984 (December 31, 1984, in the case of options issued under plans

adopted before May 15, 1984).[31] *See id.* § 555(c)(2), 98 Stat. at 898. Had Congress regarded the amendment as merely making explicit a conformance to existing law, it is doubtful that it would have made the amendment prospective only.

On balance, we find the post-1969 developments rather more adverse than favorable to the Commissioner's contentions. In any event, what we are considering here is legislation enacted in 1969, as applied to transactions occurring in 1972. Action, and *a fortiori* inaction, of subsequent Congresses is neither determinative nor strongly persuasive of the controlling legislative intent, namely, that with which the First Session of the 91st Congress enacted the relevant provisions of the Tax Reform Act of 1969. *See, e.g., United States v. Vogel Fertilizer Co.,* 102 S.Ct. at 832; *Andrus v. Shell Oil Co.,* 446 U.S. 657, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977).

## CONCLUSION

■ Sections 57(a)(6) and 83 became law as a part of the same legislative enactment. Each uses "fair market value" as a benchmark for measuring an amount of "income" to be subject to a tax—a different tax in each instance. The fair market value concept "is nearly as old as the federal income, estate, and gift taxes themselves." *Cartwright,* 93 S.Ct. at 1716. In section 83, however, this benchmark is expressly modified by the phrase "determined without reference to any [lapse] restriction". This language reflects that Congress contemplated that the phrase "fair market value" meant something *different than* "fair market value ... determined without reference to any [lapse] restriction." However, as employed in section 57(a)(6), "fair market value" has no such express modification. Moreover, section 57(a)(6) deals with the exercise of qualified stock options, and section 83, by its express terms, is inappli-

---

**31.** We assume this date relates to the time the    amendment was proposed.

cable to such transactions. The plain meaning of the legislation on its face, then, is that different measurement benchmarks are to be used in section 57(a)(6) and in section 83, and that merely because a restriction is of the "lapse" variety and thus expressly disregarded in section 83 does not necessarily mean that it is wholly irrelevant to fair market value. We might depart from this plain meaning were there some clear indication in the legislative history that Congress actually intended something other than what it plainly said. But there is no such clear indication. Further, subsequent developments do not cast any sufficiently contrary light on the intent of the 91st Congress in this respect. Nor are we able to glean from the statute or its legislative history any intention to simply leave all this to resolution by Treasury Regulation: There is no special grant of regulatory authority to define terms for purposes of section 57(a)(6) or to provide a method of executing its directives. In these circumstances, we hold that the Secretary has exceeded his general authority under section 7805(a) by providing in Treasury Regulation section 1.57–1(f)(3) that all lapse restrictions are always wholly irrelevant to determining fair market value for purposes of former section 57(a)(6). Section 7805(a) does not authorize the Secretary to substitute wholesale, as this regulation purports to do, the section 83(a)(1) benchmark in place of the intentionally different benchmark which Congress chose for former section 57(a)(6).

Accordingly, the judgment of the Tax Court is affirmed.

AFFIRMED.